## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CENTER FOR CIVIC ACTION,
PROGRESSNOW NEW MEXICO, and
SEMILLA ACTION,

     Plaintiffs,

vs.                                                                No. CIV 25-1120 JB/JHR

CITY OF ALBUQUERQUE BOARD OF
ETHICS AND CAMPAIGN PRACTICES, and
ETHAN WATSON, in his capacity as City Clerk,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Temporary Restraining Order, filed November 11, 2025 (Doc. 2)("Motion"). The Court holds a hearing on November 18, 2025. <u>See</u> Clerk's Minutes at 1, filed November 18, 2025 (Doc. 13). The primary issues are: (i) whether the Plaintiffs are likely to succeed on the merits in demonstrating that the City of Albuquerque Charter ("Charter") rules mandating the formation of Measure Finance Committees ("MFCs"), and therefore imposing registration, disclosure, and disclaimer requirements for a political committee or any person or combination of two or more persons when such person or people either accept political contributions or make political expenditures in excess of $250.00, impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, under the First and Fourteenth Amendments, U.S. CONST. amend I, XIV, such that the Charter rules are unconstitutional; (ii) whether the Plaintiffs are likely to succeed on the merits in proving that the City Clerk's rules, specifically disclaimer rules which require that Independent Expenditures, Coordinated Expenditure, and MFC Supporting or Opposing a Measure, disclose their top five donors and top two secondary donors, are beyond the scope of the Clerk's authority;

and (iii) whether the Plaintiffs are subject to the general disclaimer requirements in the Charter and Clerk's Rules. The Court concludes: The Court concludes that: (i) the Plaintiffs are likely to succeed on the merits in demonstrating that the Charter rules mandating the formation of MFC impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, because the Charter rules do not satisfy the United States Supreme Court's major purpose test for defining political committees; (ii) the Plaintiffs are not likely to succeed on the merits in proving that the City Clerk's rules, specifically disclaimer rules which require that Independent Expenditures, Coordinated Expenditure, and MFC Supporting or Opposing a Measure, disclose their top five donors and top two secondary donors, are beyond the scope of the Clerk's authority, but nevertheless the Court concludes that the City cannot properly require Plaintiffs' to comply with these donor disclaimer requirements; and (iii) the Plaintiffs are subject to the general disclaimer requirements in the Charter and Clerk's Rules.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must [ ] state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the

merits."); <u>Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505</u>, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." <u>Heideman v. S. Salt Lake City</u>, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1188. Accordingly, the Court finds as follows:

1. **The Parties.**

1. Plaintiff Center for Civic Action ("Civic Action") is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code. Plaintiff's Verified Complaint for Declaratory and Injunctive Relief ¶ 42, at 11, filed November 11, 2025 (Doc. 1)("Complaint").

2. Civic Action is a social welfare organization formed for the purpose of educating, engaging, and mobilizing historically underrepresented communities in important legislative and policy campaigns in New Mexico. <u>See</u> Complaint ¶ 44, at 11.

3. Civic Action has participated in the Albuquerque municipal elections in prior years and plans to do so in this December 9, 2025 runoff election, and in future elections by supporting or opposing Albuquerque candidates and supporting or opposing Albuquerque ballot measures. <u>See</u> Complaint ¶ 47, at 12.

4. Civic Action's annual budget is approximately $1,000,000.00. <u>See</u> Complaint ¶ 46, at 12.

5. Civic Action intends to expend approximately $25,000.00 in political speech concerning the Albuquerque run-off election. <u>See</u> Complaint ¶ 49, at 12.

7.     These expenditures include making monetary or in-kind contributions to MFCs, distributing advertisements, and canvassing voters to support or oppose run-off candidates for the Albuquerque municipal election.  See Complaint ¶ 49, at 12.

8.     Plaintiff ProgressNow New Mexico ("ProgressNow") is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code.  See Complaint ¶ 52, at 12.

9.     ProgressNow is a social welfare organization formed for the primary purpose of creating an ongoing issue advocacy culture in New Mexico by focusing on amplifying the voices of those systematically excluded, ultimately giving communities the tools they need to shape their own future.  See Complaint ¶ 54, at 13.

10.     ProgressNow has participated in the Albuquerque municipal elections in prior years, and plans to do so in this December 9, 2025 runoff election, and in future elections by supporting or opposing Albuquerque candidates, and supporting or opposing Albuquerque ballot measures.  See Complaint ¶ 57, at 13.

11.     ProgressNow's annual budget is approximately $360,000.00.  See Complaint ¶ 56, at 13.

12.     ProgressNow would like to spend approximately $15,000.00, in political speech concerning the Albuquerque run-off election.  See Complaint ¶ 58, at 13.

13.     These expenditures include distributing paid social media advertisements to support or oppose run-off candidates for the Albuquerque municipal elections.  See Complaint ¶ 58, at 13.

14.     Plaintiff Semilla Action is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code.  See Complaint ¶ 62, at 14.

15.     Semilla Action is a social justice and environmental advocacy organization that

works to influence policy and engage communities in climate and racial justice movements.  See Complaint ¶ 64, at 14.

16.    Semilla Action wants to participate in this and future elections by supporting or opposing Albuquerque candidates, and supporting or opposing Albuquerque ballot measures.  See Complaint ¶ 67, at 14.

17.    Semilla Action has not participated in prior Albuquerque elections because of the requirements that Albuquerque imposes upon Albuquerque MFCs.  See Complaint ¶ 67, at 14.

18.    Semilla Action intends to spend approximately $20,000.00 in political speech concerning the Albuquerque run-off election.  See Complaint ¶ 68, at 14.

19 .    These expenditures include canvassing voters and providing door literature to support or oppose run-off candidates for the Albuquerque municipal election.  See Complaint ¶ 68, at 14.

20.    Defendant Ethan Watson is the duly appointed City Clerk of Albuquerque, and is responsible for administering elections, overseeing campaign finance disclosures, and implementing the City's campaign finance laws and rules.  See Complaint ¶ 10, at 4.

21.    The Albuquerque City Charter, Albuquerque, Albuquerque City Charter Art. XIII § 2(y),    https://codelibrary.amlegal.com    codes/albuquerque/latest/albuqcharter/0-0-0-471 ("Albuquerque Charter"), vests the City Clerk with authority to promulgate rules, issue guidance, and enforce compliance with campaign finance requirements, including the power to investigate, refer matters to the Board of Ethics and Campaign practices, and impose administrative penalties. See Complaint ¶ 10, at 4.

22.    The Plaintiffs sued Defendant Ethan Watson in his official capacity as City Clerk, and at all times relevant to the Complaint, Watson acts under color of state and municipal law.  See

Complaint ¶¶ 10-11, at 4.

23.    The City of Albuquerque, pursuant to Albuquerque City Charter XII, establishes Defendant Albuquerque Board of Ethics and Campaign Practices ("Board of Ethics"), an administrative body.  See Complaint ¶ 12, at 4.

24.    The Board of Ethics is charged with the authority to interpret, administer, and enforce the City's campaign finance laws and ethics code, including adjudicating complaints, imposing fines, and issuing advisory opinions.  See Complaint ¶ 12, at 4.

25.    The Plaintiffs sued the Board of Ethics in its official capacity as the entity responsible for applying and enforcing the campaign finance rules and regulations that are the subject of this action and, at all times relevant to the Complaint, acts under color of State and municipal law.  See Complaint ¶¶ 12-13, at 4-5.

**2.    The Albuquerque Charter.**

26.    The Albuquerque Charter defines a MFC:

[A] political committee or any person or combination of two or more persons acting jointly in aid of or in opposition to the effort of anyone seeking to have their name placed on the ballot for city office, a petition to place a measure on the ballot pursuant to Article III of this Charter, voter approval or disapproval of one or more measures on the ballot and/or the election to, or recall from, office of one or more candidates for office when such person or people have accepted contributions in excess of $250 or make expenditures in excess of $250 for any of the purposes listed heretofore.

Albuquerque Charter Art. XIII § 2(y).

27.    The Albuquerque Charter defines "person" as "any individual, cooperative association, club, corporation, company, firm, partnership, joint venture syndicate, profit or nonprofit organization, or other entity."  Albuquerque Charter Art. XIII § 2(z).

28.    The Albuquerque Charter requires that MFCs register with the City Clerk once they raise or spend more than $250.00 in support of or opposition to a city measure or candidate.  See

Albuquerque Charter Art. XIII § 6.

25.     The Albuquerque Charter mandates that each MFC establish one campaign checking account per election, the MFC must deposit all contributions into that account, and the MFC must where all contributions received must be deposited into that account, and the MFC must make all disbursements from that account.  See City Charter Art. XIII § 4(c).

26.     On a monthly basis, the MFC must submit bank statements reflecting the prior month's activity to the Campaign & Election Auditor by the second Monday of each month, for as long as the MFC must file reports.  See Charter Art. XIII § 4(c)(3).

27.     The MFC must file regular statements with the City Clerk disclosing:

> a.     The total of all contributions.
> b.     For individual contributors: name, address, occupation, employer (where applicable), business address, and the amount of each contribution and cumulative totals.
> c.     For non-individual contributors: name, address, nature of business or activities, and identities of owners or managers of the contributor, plus the amount of each contribution and cumulative totals.
> d.     All expenditures, including reimbursements, the nature of the expenditure, and payee names and addresses.
> e.     If the MFC supports or opposes more than one candidate or measure, the disclosures must allocate contributions and expenditures to the specific candidate(s) or measure(s) appropriately, and any overlapping expenses must be apportioned pro rata.

Albuquerque Charter Art. XIII § 4(d).

28.     Reporting continues until the MFC files a dissolution report affirming the MFC no longer exists and that its bank account balance is zero.  See Albuquerque Charter Art. XIII § 4(d)(2)(F).

29.     The final campaign financing statement must disclose the method by which the MFC disposes of any remaining funds – returns funds to donors, gifts to charity, or transfers to the City's General Fund, or retains for runoff.  See Albuquerque Charter Art. XIII, Sec 4(i).

30.    The City of Albuquerque terminates MFC registrations every year on December 31st.  See Albuquerque Charter Art. XIII § 6(c).

31.    The Albuquerque Charter requires the MFCs to file with the City Clerk images of all broadly distributed campaign material on or before the day that the financial report disclosing the expenditure for said campaign material is due.  See Albuquerque Charter Art. XIII § 5(a).

32.    The Albuquerque Charter requires that candidates and chairpersons of MFCs ensure that all campaign materials display a clear and conspicuous disclaimer stating information on how the MFC paid for the material and any additional information which the rules that the City Clerk promulgates requires.  See Albuquerque Charter Art. XIII § 5(b).

33.    The Albuquerque Charter defines "campaign material" as "any published, printed, or broadly distributed campaign advertising or communications such as newspaper advertisements, handbills, petitions, circulars, letters, radio or TV broadcasts, cable distributions, social media sites, websites, electronic or telephonic transmissions or similar written material used in a campaign by a candidate or Measure Finance Committee."  Albuquerque Charter Art. XIII § 2(d).

34.    The MFCs are subject to civil penalties -- "a public reprimand or . . . a fine not to exceed the maximum amount authorized by state law, or do both" -- if they fail to comply with the City Charter and the Clerk's Rules' registration and reporting requirements.  See City Charter Art. XIII § 10.

**3.    The Clerk's Rules.**

35.    The Clerk's Rules take effect on February 10, 2025. See Notice of Final Rulemaking -- Election Code, CITY OF ALBUQUERQUE -- CITY CLERK, https://www.cabq .gov/clerk/news/notice-of-final-rulemaking-election-code-1.

36.    The Clerk's Rules "apply to candidates, Measure Finance Committees, candidate

committees, and all individuals, entities, and organizations governed by, or subject to, the provisions of the City Charter and State Law." 2025 Rules by the Albuquerque City Clerk for the Election Code and the Open and Ethical Election Code of the City Charter, Part 2(C), at 5, filed November 11, 2025 (Doc. 1)("Clerk Rules").

37.    The Clerk's Rules acknowledge that if the Rules "conflict with the provisions of the City Charter or State Law, the provisions of the City Charter or State Law shall prevail." Clerk's Rules Part 2(B), at 5.

38.    The Clerk's Rules require the MFCs and candidates to disclose the name of the campaign or committee that authorizes the distribution or broadcast of campaign materials. See Clerk's Rules Part 18(A), at 39.

39.    The Clerk's Rules define "disclaimer" as "a disclosure and means a statement identifying the person(s), organization(s), or political committee(s) who paid for, or is otherwise responsible for funding or authorizing campaign materials. It includes any notice required to ensure transparency about the origin, financial backing, and authorization of such materials." Clerk's Rules Part 1(4), at 4.

40.    The Clerk's Rules contain additional disclaimer requirements for Independent Expenditure, Coordinated Expenditures, and MFC Supporting or Opposing a Measure:

> 1.    **In addition** to the required disclaimers, campaign materials produced for Independent Expenditures, or Measure Finance Committees shall include:
>
> > a.    The words "**Paid for by**" followed by the name of the entity making the expenditure and its Chairperson;
> >
> > b.    The words "**Top Five Donors" followed by a list of the five (5)** persons or entities making the largest aggregate donations to the entity during the twelve (12) month period before the date of the communication; and
> >
> > c.    For **Independent Expenditures and Measure Finance**

> **Committees**: A statement that the campaign material is not authorized by any candidate or candidate's campaign committee.
>
> d.    For **Coordinated Expenditure**: A statement that it is authorized by a campaign or committee, and the communication must include the name of the campaign or committee that authorized the expenditure.
>
> 2.    **Secondary Donor.** If any of the top five donors is a committee, organization, or other entity the disclaimer must also disclose the name of the **top two donors of $1,000 or more to that committee.**

Clerk's Rules Part 18(B), at 40 (emphasis in original).

## PROCEDURAL BACKGROUND

On November 11, 2025 the Plaintiffs filed the Complaint. See Complaint at 1. In the Complaint, the Plaintiffs allege claims for: (i) violation of the First and Fourteenth Amendments' guarantee of free speech and expression due to the Charter and City Clerk Rules that define an MFC as any group that raises or spends more than $250.00 in support of or opposition to a candidate or ballot measure; (ii) violation of the First and Fourteenth Amendments guarantee of free speech and the Fourteenth Amendment due process rights because of the vagueness and overbreadth of the disclaimer requirements for donors in the Clerk's Rules; and (iii) that the Clerk's Rules impermissibly extend the scope of the Charter, and therefore constitute an abuse of authority and are invalid as an ultra vires act. See Complaint ¶¶ 72-94, at 15-20. The Plaintiffs request that the Court declare the aforementioned portions of the Charter and Clerk Rules unconstitutional, declare that the City Clerk has exceeded his authority under the City Charter, and enjoin the Defendants from enforcing the "MFC registration, reporting, disclosure, and disclaimer requirements against Plaintiff and any other group whose major purpose is not the nomination or election of candidate." Complaint ¶ 96, at 20-21.

### 1.    The Motion.

On November 11, 2025 Plaintiffs filed the Motion, which requests that the Court grant a

temporary restraining order, or in the alternative a preliminary injunction, enjoining the Defendants from enforcing the "measure finance committee registration and reporting, disclaimer, and donor disclosure provisions against Plaintiffs" to allow Plaintiffs to speak during the Albuquerque run-off election cycle without the fear of facing "imminent enforcement and penalties." Motion at 16. The Plaintiffs argue that they are likely to succeed on the merits on all three claims. First, the Plaintiffs argue that the Charter's MFC requirement, which requires any person or group to register as an MFC if they raise or spend more than $250.00, violates the First Amendment because it is unconstitutionally overbroad. Motion at 8. The Plaintiffs cite to <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976) in which the Supreme Court held that only groups "'under the control of a candidate' or . . . whose 'major purpose is the nomination or election of a candidate' may be subject to the burdensome registration, recordkeeping, and disclosure obligations of political committees," to prevent unconstitutional overbreadth. Motion at 8 (quoting 424 U.S. 1, 79 (1976)). The Plaintiffs argue that the Tenth Circuit has adopted <u>Buckley's</u> "major purpose" test, and while the Plaintiffs acknowledge that the Tenth Circuit has so far only applied this "major purpose" test to state statutes, the Plaintiffs argue that the "major purpose" test "is a constitutional requirement derived from the First Amendment, and as such, it applies to all governmental entities within the United States, including municipalities. . . ." Motion at 9. The Plaintiffs maintain that failure to comply with the "major purpose" test results in political committee registration and disclosure requirements that are unconstitutionally overbroad. <u>See</u> Motion at 9. The Plaintiffs argue additionally that "any registration, disclosure, or reporting requirements imposed on political committees must satisfy 'exacting scrutiny'. . . ." Motion at 9.

Next, the Plaintiffs argue that the Clerk's Rules disclaimer requirements -- specifically the requirement that entities or individuals making independent or coordinated expenditures must

"disclose on their advertisements their top five donors as well as the top two secondary donors" -- constitutes compelled speech. Motion at 11. Plaintiffs argue that compelled speech is subject to heightened scrutiny, and that these disclaimer requirements do not demonstrate the required "substantial relationship to a sufficiently important governmental interest" which is narrowly tailored to the interest, and therefore the disclaimer requirements are unconstitutional. Motion at 11-12. The Plaintiffs contend that the Clerk's Rules are unconstitutional because they are "ambiguous, overbroad and chill speech and association rights." Motion at 12. Additionally, Plaintiffs argue that the aforementioned disclaimer rules of the Clerk's Rules are unconstitutionally vague and therefore void, because the terms "entity," "required disclaimers," and "secondary donor" are not defined by the Charter or the Clerk's Rules, and therefore "an entity that is not an MFC has no reference to what, if any, 'required disclaimers' apply to them." Motion at 13. Plaintiffs also contend that the term "secondary donor" is unconstitutionally vague because "it is unclear whether 'secondary donor' refers to (i) the second-largest direct donor to the 'entity' making coordinated or independent expenditures after the top five donors; (ii) the second donor that is not a 'committee, organization, or other entity' that donated to the entity, or (iii) an indirect donor who contributed to one of the entity's top five donors." Motion at 13-14.

Finally, Plaintiffs argue that the City Clerk has exceeded his authority under the Charter. See Motion at 14. The Charter defines "campaign materials" as "only those communications used by candidates and Measure Finance Committees." Motion at 14. The Plaintiffs contend that the Clerk's Rules impermissibly expand upon this definition, because the Clerk's Rules are said to cover "all individuals, entities, and organizations governed by, or subject to, the provisions of the City Charter and State Law." Motion at 14 (quoting Clerk's Rules Part (2)(C), at 5). As a result, the Plaintiffs argue that the City Clerk has "unilaterally imposed disclaimer and disclosure

obligations on groups and persons outside the Charter's scope of who is regulated by disclaimer requirements for 'campaign materials' and beyond the Charter's grant of authority."  Motion at 14. The Plaintiffs maintain that this action by the City Clerk constitutes an ulta vires act, and therefore these rules are void and unenforceable.  See Motion at 14.

The Plaintiffs next argue that they will suffer irreparable harm if the Court denies injunctive relief.  See Motion at 15.  The Plaintiffs assert that the loss of First Amendment freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury." Motion at 15 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  The Plaintiffs state that they are "chilled from engaging in core political speech during the election cycle," that their right to participate in the political process cannot be restored after the election, and "no damages remedy can repair this harm once the election has passed."  Motion at 15.  The Plaintiffs also maintain that the balance of equities favors the Plaintiffs, because the Defendants will suffer no harm from temporary non-enforcement of unconstitutional provisions, whereas Plaintiffs "face fines, reputational harm, and chilled speech."  Motion at 15.  The Plaintiffs in support mention that the "Tenth Circuit has consistently held that the injury to a plaintiff deprived of First Amendment rights almost always outweighs potential harm to the government if an injunction is granted."  Motion at 15 (citing Verlo v. City & Cnty. Of Denver, 124 F.Supp.3d 1083, 1092 (D. Colo. 2015) and Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012)).  Finally, the Plaintiffs maintain that the public interest supports an injunction, because the "public interest is served by protecting free political expression and ensuring government compliance with the Constitution."  Motion at 15.

## LAW REGARDING TEMPORARY RESTRAINING ORDERS

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F.

- 13 -

Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days. See Fed. R. Civ. P. 65(b)(1)-(2). In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)). See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181. The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a temporary restraining order under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed. R. Civ. P. 65(b). "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355). A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v.

Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542, (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs ... could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Diné, 839 F.3d 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement. See Fed. R . Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial

court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable."). See also Flood v. ClearOne Comm'ns, 618 F.3 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,'" and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Tenth Circuit has identified three categories of disfavored preliminary injunctions— mandatory injunctions, injunctions that alter the status quo, and injunctions that give the movant all the relief to which he or she would be entitled if he or she won at trial—and the requested injunction does not fall into any of them. See O Centro, 389 F.3d at 975. A district court can determine whether a requested injunction is disfavored by looking at the relief it seeks. See O Centro, 389 F.3d at 1003. The strength of the movant's case or of the nonmovant's defenses, the peril that the movant faces if the request is denied, and the burden that the requested injunction would impose on the enjoined party—considerations of central importance in deciding whether to grant a preliminary injunction—have no effect on this analysis. See Schrier v. Univ. of Colo., 427 F.3d at 1259. The analytical effect of branding a requested preliminary injunction as "disfavored" is that it "warrants a heightened standard of proof," Schrier v. Univ. of Colo., 427 F.3d at 1259, and that it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course," O Centro, 389 F.3d at 975. A request for a disfavored injunction must thus make a stronger holistic showing in the four-prong analysis.

The first disfavored category is "mandatory preliminary injunctions." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted). The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively

require[s] the nonmovant to act in a particular way, and as a result ... place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro, 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something. See Schrier v. Univ. of Co., 427 F.3d at 1261. It does so because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it.  An injunction directing a party to do something is not the biggest deal in the world -- and not fundamentally different from an injunction prohibiting something -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction. On the other hand, necessarily vague injunctions enjoining parties to "depopulate the jail system to constitutionally compliant levels," or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor. Dine Citizens Against Ruining Our Env't v. Jewell, No. CIV 15–0209 JB/SCY, 2015 WL 4997207, at *33 (D.N.M. Aug. 14, 2015)(Browning, J.). The second disfavored category is "preliminary injunctions that alter the status quo." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted). The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Stemple v. Bd. of Educ. of Prince George's Cnty., 623 F.2d 893 (4th Cir.1980). When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the

existing status and relationships between the parties, regardless of whether the existing status and

relationships may ultimately be found to be in accord or not in accord with the parties' legal

rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir.1991), overruled on

other grounds by O Centro, 389 F.3d at 975. If a court instead looks at the parties' legal rights, then

a preliminary injunction will always change the status quo. The third and final disfavored category

is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion

of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389

F.3d at 977)(internal quotation marks omitted).

## LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First

Amendment grounds, and, if successful, it results in the invalidation of the entire statute. "To

succeed, the challenged statute must regulate substantially more expression than the First

Amendment allows governments to regulate." United States v. Streett, 434 F. Supp. 3d 1125, 1168

(D.N.M. 2020)(Browning, J.), aff'd, 83 F.4th 842 (10th Cir. 2023). The party challenging the

statute need not have been engaged in constitutionally protected expression to have standing to

challenge the law; even if the law is constitutional as applied to the challenging party, if the law is

found to be overbroad, it is invalid in its entirety. See Village of Schaumburg v. Citizens for a

Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy, a litigant whose own activities

are unprotected may nevertheless challenge a statute by showing that it substantially abridges the

First Amendment rights of other parties not before the court." (citations omitted)). There are, thus,

two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive

aspect and the standing aspect.

**1.      The Substantive Aspect: Inverting the Usual Rule for Facial Challenges.**

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Overbreadth is not quite the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial." Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987). The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to ... ordinances. However, this presumption does not apply when the challenged statute infringes upon First Amendment rights." (omission in original)(citations and internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim.  In that case, a club that featured nude dancing challenged a city ordinance that purported to ban all live entertainment in commercial zones. See 452 U.S. at 63-64. Although the Supreme Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic events -- that the First Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66.  The Supreme Court did not do as they might have done in non-First Amendment settings and narrowly interpret the ordinance to ban only constitutionally unprotected speech, but rather struck the ordinance down entirely as

overbroad. See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973). As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.
>
> The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." New York v. Ferber, 458 U.S. 747, 772 (1982). In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984). Further, "[w]hen assessing whether an overbroad statute is likely to chill third parties from engaging in protected expression, courts should assess not only whether the number of unconstitutional potential applications of the statute is significant relative to the overall number of applications, but also the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement." United States v. Streett, 434 F.Supp.3d at 1170-71.

Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled. See Richard Fallon, Jr., Making Sense of Overbreadth, 100 YALE L. J. 853, 894 (1991). Under this view, a statute that chills a swath of political speech should be more

readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges. Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to commercial speech." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

In Griffin v. Bryant, 30 F.Supp.3d 1139 (D.N.M. 2014)(Browning, J.), the Court found that a plaintiff had standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body. Even though the plaintiff had not been penalized for violating the municipality's rule, because the rule likely affected his speech, he had suffered a sufficient injury in fact to establish standing.  See Griffin v. Bryant, 30 F.Supp.3d at 1175-77.

### 2.    The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute.  See United States v. Salerno, 481 U.S. at 745. An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial  challenge requires this showing as well and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied.  United States v. Salerno, 481 U.S. at 745. A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge.  The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect

the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge. Although a successful as-applied challenge does not guarantee a victorious facial challenge -- the court could find the statute's overbreadth insubstantial -- it is not necessary to have a viable as-applied challenge to succeed on a facial challenge. "[W]here the claim is that a statute is overly broad in violation of the First Amendment, ... [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957, 104 S.Ct. 2839. Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech as well.

## LAW REGARDING FIRST AMENDMENT POLITICAL COMMITTEE MAJOR PURPOSE TEST

In Buckley v. Valeo the Supreme Court held that political committees may be properly subject to extensive reporting and disclosure requirements. 424 U.S. at 79 (1976)("Buckley"). The Supreme Court concluded, however, that the term political committee constitutionally may "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." Buckley, 424 U.S. at 79. This test is not disturbed by the Supreme Court's later decision in McConnell v. Federal Election Com'n, which largely upholds

key provisions of the Bipartisan Campaign Reform Act (BRCA), regulating campaign finance and limiting soft money contributions to political parties.  540 U.S. 93, 224 (2003).  "There is little question that Buckley's 'major purpose test' is left unaltered in the wake of McConnell."  Colorado Right To Life Comm., Inc. v. Coffman, 498 F.3d 1137, 1152 (10th Cir. 2007)("CRLC")(citing Political Committee Status, Definition of Contribution, and Allocation for Separate Segregated Funds and Nonconnected Committees, 69 Fed.Reg. 68,056, 68,065 (Nov. 23, 2004)("[N]o change through regulation of the definition of 'political committee' is mandated by [the Bipartisan Campaign Reform Act, ("BRCA")] or the Supreme Court's decision in McConnell.  The 'major purpose test' is a judicial construct that limits the reach of the statutory triggers in FECA for political committee status.  The Commission has been applying this construct for many years without additional regulatory definitions, and it will continue to do so in the future").

The Tenth Circuit has adopted and applied this major purpose test, and has defined two methods for determining an organization's major purpose: "(1) examination of the organization's central organizational purpose; or (2) comparison of the organization's electioneering spending with overall spending to determine whether the preponderance of expenditures is for express advocacy or contributions to candidates."  New Mexico Youth Organized v. Herrera, 611 F.3d 669, 678 (10th Cir. 2010)("NMYO")(citing CRLC, 498 F.3d at  1152).  Further, the Tenth Circuit has concluded that the trigger of a certain dollar spend amount as the defining factor of a political committee is "an unacceptable proxy for the major purpose test."  NMYO, 611 F.3d at 678 (citing CRLC at 1153).

In CRLC, the Tenth Circuit addresses a Colorado constitutional amendment that requires registration and reporting by political committees.  498 F.3d  at 1137.  The definition of "political committee" under this constitutional amendment is "any person, other than a natural person, or any

group of two or more persons, including natural persons that have accepted or made contributions to expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates." CRLC, 498 F.3d at 1141. The Tenth Circuit held that a $200.00 trigger, standing alone, is incompatible with a "major purpose" test. CRLC, 498 F.3d at 1153. The Tenth Circuit explained that "the amount of money an organization must accept or spend -- $200 -- is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." CRLC, 498 F.3d at 1153 (quoting Colo. Right to Life Comm., Inc. v. Davidson, 395 F.Supp.2d 1001, 1021 (D.Colo.2005)). The Tenth Circuit thus concluded that a $200.00 trigger could not serve as a proxy for the major purpose test, reasoning that for some groups -- for example ones with budgets of $200,000.00 -- a $200.00 expenditure is a trivial amount. CRLC, 498 F.3d at 1154.

In NMYO, the Tenth Circuit addresses an attempt by the New Mexico Secretary of State to regulate two 501(c)(3) nonprofit organizations as political committees under the New Mexico Campaign Reporting Act ("NMCRA"). See 611 F.3d at 671, 673. Under the NMCRA, an organization that "spends $500 on an election-related expense is automatically subject to the reporting requirements and other limitations imposed on a political committee, regardless of what percentage of operating funds that $500 constitutes or what else the organization spends its resources on." NMYO, 611 F.3d at 679. The Tenth Circuit concludes that this automatic classification of "such organizations as political committees contradicts the Supreme Court's repeated admonition that only organizations that have 'the major purpose' of electing or defeating a candidate may be forced to register as political organizations." NMYO, 611 F.3d at 679. Therefore, the Tenth Circuit concludes that the attempt to regulate the organizations as political committees is unconstitutional as applied. NMYO, 611 F.3d at 679.

- 24 -

## LAW REGARDING DISCLOSURE AND DISCLAIMER REQUIREMENTS

"Reporting and disclosure requirements . . . can infringe on the right of association." Sampson v. Buescher, 625 F.3d 1247, 1255 (10th Cir. 2010)(citing Buckley, 424 U.S. at 64).  "As stated by Justice Brennan for a plurality in Federal Election Commission v. Massachusetts Citizens for Life, 479 U.S. 238, 254 (1986), 'Detailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of records, impose administrative costs that many small entities may be unable to bear.'"  Sampson v. Buescher, 625 F.3d at 1255.  Nevertheless, not all burdens on freedom of association are unconstitutional.  In particular, "disclosure requirements in the electoral context" may be upheld if they survive "exacting scrutiny."  John Doe No. 1 v. Reed, 561 U.S. 186, 196 (2010).  "That standard "requires a substantial relation between the disclosure requirement and a sufficiently important government interest.'"  John Doe No. 1 v. Reed, 561 U.S. at 196 (quoting Citizens United v. Federal Election Com'n, 558 U.S. 310, 366-67 (2010). "In determining whether these [governmental] interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights."  Buckley v. Valeo, 424 U.S. at 68.  The requirements that "independent expenditures be reported to some governmental entity and made available to the public" are supported by "three compelling governmental interests."  Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d 1174, 1197 (10th Cir. 2000).  "First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office."  Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d at 1197 (quoting Buckley v. Valeo, 424 U.S. at 66).  "Second, disclosure requirements 'deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.'"  Citizens for Responsible

Gov't State Pol. Action Comm. v. Davidson, 236 F.3d at 1197 (quoting Buckley v. American Constitutional Law Foundation, 525 U.S. 182, 202 (1999)). "Third, . . . recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations. . . ." Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d at 1197 (quoting Buckley, 424 U.S. at 67-68).

Disclaimer requirements are subject to the same standard, exacting scrutiny, as disclosure requirements. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 366 (2010)("Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking. The Court has subjected these requirements to exacting scrutiny. . . .")(internal citations omitted). The Tenth Circuit, however, has stated that "[t]he Supreme Court has recognized that disclaimer statutes, which require that a speaker include specified language or information in her speech, impose more substantial burdens on First Amendment rights than disclosure or reporting provisions. . . ." Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d at 1199 (citing McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 355 (1995). In Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, the Tenth Circuit stated that "[l]ike disclosure provisions, disclaimer requirements are subject to strict scrutiny." 236 F.3d at 1199. In reaching this conclusion, however, the Tenth Circuit relies on McIntyre v. Ohio Elections Comm'n, specifically citing "disclaimer requirements as 'a limitation on political expression subject to exacting scrutiny.'" Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d at 1199 (quoting 514 U.S. at 346). Therefore, because the Tenth Circuit, in applying strict scrutiny to disclaimer requirements, relies on Supreme Court case law which applies exacting scrutiny, and because Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson is decided in 2000, before the Supreme

Court decides <u>Citizens United v. Fed. Election Comm'n</u> in 2010, the Court concludes that the appropriate standard to apply to disclaimer requirements is exacting scrutiny.

The Court does note that the Supreme Court recently revisited the issue of exacting scrutiny in <u>Americans for Prosperity Foundation v. Bonta</u>, where the Court considered the constitutionality of a California law that compelled the disclosure of a charity's major donors. 594 U.S. 595, 602 (2021). In <u>Americans for Prosperity Foundation v. Bonta</u>, a majority of the Court failed to reach an agreement on the standard of review. The Chief Justice, joined by Justices Kavanaugh and Barrett, stated that exacting scrutiny applies to First Amendment challenges to compelled disclosure. <u>Americans for Prosperity Foundation v. Bonta</u>, 594 U.S. at 607. Justice Thomas, concurring in part and concurring in the judgment, would have applied strict scrutiny because the California law required compelled disclosure of protected First Amendment associations. <u>Americans for Prosperity Foundation v. Bonta</u>, 594 U.S. at 619. Finally, Justice Alito, joined by Justice Gorsuch, concurring in part and concurring in the judgment, stated that "I am not prepared at this time to hold that a single standard applies to all disclosure requirements. And I do not read our cases to have broadly resolved the question in favor of exacting scrutiny." <u>Americans for Prosperity Foundation v. Bonta</u>, 594 U.S. at 619. The Court concludes, however, that because <u>Citizens United v. Fed. Election Comm'n</u> applies exacting scrutiny to disclosure and disclaimer requirements in the election context, and <u>Americans for Prosperity Foundation v. Bonta</u> does not specifically overrule <u>Citizens United v. Fed. Election Comm'n's</u> holding regarding the standard of review, that it is appropriate to conclude that exacting scrutiny is the correct standard for both disclosure and disclaimer requirements.[1]

---

[1] In so concluding, the Court follows the approach taken by the Honorable Philip A. Brimmer, Chief United States District Judge for the District of Colorado, in <u>Lakewood Citizens Watchdog Grp. v. City of Lakewood</u>, No. 21-CV-01488-PAB, 2021 WL 4060630, at *3 (D.

## LAW REGARDING A STATUTE BEING VOID FOR VAGUENESS

"Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998)(quotation marks omitted). "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." United States v. Williams, 553 U.S. 285, 304 (2008). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)). See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement."); Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." United States v. Williams, 553 U.S. at 306, 128 S.Ct. 1830.  The Supreme Court has noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." United States v. Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

In Grayned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the

---

Colo. Sept. 7, 2021).

interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110 (internal quotations omitted).  For example, in <u>Minority Television Project Inc. v. F.C.C.</u>, No. C-06-02699, 2007 WL 4570293, at *1 (N.D. Cal. December 21, 2007)(Laporte, J.), <u>aff'd,</u> 475 F. App'x 671 (9th Cir. 2012), <u>on reh'g en banc,</u> 736 F.3d 1192 (9th Cir. 2013), and <u>aff'd,</u> 736 F.3d 1192 (9th Cir. 2013), the Honorable Elizabeth D. Laporte, United States District Judge for the Northern District of California, found it premature to dismiss a facial challenge of void for vagueness until the plaintiffs introduced evidence of the Federal Communication Commission's ("FCC") enforcement decisions applying the statute in question -- a prohibition against certain paid promotional advertisements. <u>See</u> 2007 WL 4570293, at *9.  When the plaintiffs submitted evidence of the FCC's enforcement, Judge Laporte found the statute was not unconstitutionally vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, <u>see</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute.  If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge.  Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" <u>California Teachers Ass'n v. State Bd. of Educ.</u>, 271 F.3d 1141, 1151 (9th Cir. 2001)(quoting <u>Hill v. Colorado</u>, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(quotation marks omitted)).  As in <u>Grayned</u>, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at 110 (quoting <u>Esteban v. Central Missouri State College</u>, 415 F.2d 1077, 1088 (8th Cir. 1969)).

<u>Minority TV Project Inc. v. FCC</u>, 649 F.Supp.2d 1025, 1047 (N.D. Cal. 2009).  The Supreme Court in <u>Grayned v. City of Rockford</u> noted: "Condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110. The Supreme Court rejected a facial vagueness challenge to an ordinance that implicated First Amendment rights and prohibited

certain demonstrations "adjacent" to schools that "disturb[ ] or tend[ ] to disturb the peace or good order of such school session or class thereof," finding that it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance. 408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes have withstood facial vagueness challenges even though they contained arguably ambiguous language. See Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person, without that person's "consent," to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably interfere" with access to public buildings); Kovacs v. Cooper, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification).

## ANALYSIS

The Court grants Plaintiffs' request for a TRO, because the Court concludes that the Plaintiffs have established the four requisite prongs.  First, the Court explains why the Plaintiffs are likely to succeed on the merits regarding the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Charter and Clerk's Rules general disclaimer requirements, the factor which the Tenth Circuit has identified as "often [] the

determinative factor" in the First Amendment context.  See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013).  Next, the Court explains why Plaintiffs will suffer irreparable harm absent the requested relief on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Charter and Clerk's Rules general disclaimer requirements.  Then, the Court addresses the balance of harms factor, and determines that the balance of harms weighs in Plaintiffs' favor on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Charter and Clerk's Rules general disclaimer requirements.  Finally, the Court determines that the public interest weighs in Plaintiffs' favor on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Charter and Clerk's Rules general disclaimer requirements, before outlining the relief it provides to Plaintiffs with this Order.

There are some preliminary injunctions that courts disfavor "and so require more of the parties who request them." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trials." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harm factors: [plaintiff] must make a strong showing that these tilt in her

favor." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)).  Defendants argue that Plaintiffs' requested relief falls into the first and third categories -- "Plaintiffs seek to alter the status quo and ask the Court to provide all the substantive relief (apart from fees and costs) that they could recover were they to prevail at trial on the merits."  Defendants' Response to Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction, at 5, filed November 17, 2025 (Doc. 12)("Response).  The Court concludes that the TRO that the Plaintiffs seek does meet the qualifications for a "disfavored" preliminary injunction, because the Plaintiffs seek to disrupt the status quo, change campaign finance requirements during an election cycle, and the Plaintiffs are asking or all the substantive relief, apart from fees and costs, that the Plaintiffs could receive at trial. Therefore, the Court concludes that the Plaintiffs are subject to a higher burden on the likelihood-of-success-on-the-merits and the balance-of-harm factors.  The Court nevertheless concludes, however, that the Plaintiffs are able to meet this higher burden and make a strong showing on the likelihood-of-success-on-the-merits and the balance-of-harm factors for the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Charter and Clerk's Rules general disclaimer requirements, and therefore the Court grants the "disfavored" TRO in part and denies it in part.

I.    **THE COURT DETERMINES THAT THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS REGARDING THE UNCONSTITUTIONALY OF THE MFC REGISTRATION AND DISCLOSURE REQUIREMENTS, AS WELL AS THE CLERK'S RULES DONOR DISCLAIMER REQUIREMENTS, BUT NOT ON THE MERITS OF THE UNCONSTITUTIONALITY OF THE GENERAL DISCLAIMER REQUIREMENTS.**

To secure a TRO, a party must first establish that it is substantially likely to succeed on the merits.  See Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d 1221, 1232 (10th Cir. 2019).  Under the "disfavored" preliminary injunction standard, the Plaintiffs still do not need to prove their

likelihood of success beyond all doubt, but they must make a strong showing that this factor, entitlement to relief on the merits, tilts in their favor.  Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)).  For purposes of this TRO, the likelihood of that success turns on two issues: (i) whether the City Charter's definition of Measure Finance Committee, and the subsequent imposition of reporting and disclosure requirements on entities that satisfy the definition, is constitutional given that the MFC definition does not satisfy the Supreme Court's major purpose test for defining political committees from Buckley; and (ii) whether the City Clerk's rules, which expand the City Charter and apply both general disclaimer requirements and donor disclaimer requirements to entities that are not classified as MFCs, are constitutional as applied.

### A. THE COURT CONCLUDES THAT MEASURE FINANCE COMMITTEE MUST BE DEFINED ACCORDING TO BUCKLEY'S MAJOR PURPOSE TEST TO BE CONSTITUTIONAL.

In Buckley, the Supreme Court states that: "[t]he lower courts have construed the words "political committee" more narrowly.  To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79.  Defendants argue that this requirement is not a constitutional requirement, but instead a statutory construction creation, and points to precedent from the Seventh Circuit in support of this contention.  See Response at 8 (quoting Center for Individual Freedom v. Madigan, 697 F.3d 464, 487-88 (7th Cir. 2012)("Madigan")).  In Madigan, the plaintiff brought a facial challenge against Illinois's disclosure requirements, in part, because they allowed regulation of groups who didn't have the singular major purpose of influencing election campaigns.  Madigan, 697 F.3d at 470.  So, plaintiff argued, Illinois' definition of political committee was unconstitutionally vague and overbroad.  Madigan, 697 F.3d at 486-87.

- 33 -

The Seventh Circuit held that the "major purpose" limitation in Buckley "was a creature of statutory interpretation, not constitutional command" and thus not applicable to a state's regulation of political committees. Madigan, 697 F.3d at 487. And the Seventh Circuit identified several reasons why Buckley's major purpose limitation shouldn't apply to Illinois's disclosure requirements. Madigan, 697 F.3d at 487. These reasons included: it could yield "perverse" results by excusing registration of a "mega-group" that spends a large amount of money but just a small portion of its budget on express advocacy; and it could permit a group to circumvent disclosure requirements by merging with a non-campaign related organization or otherwise diluting its purpose. Madigan, 697 F.3d at 488-90. The Seventh Circuit also distinguished between the federal statute at issue in Buckley and the state statute at issue before the court, stating "Buckley's limiting construction was drawn for the statute before it, and the Supreme Court has never applied a 'major purpose' test to a state's regulation of political committees." Madigan, 697 F.3d at 487-88. The Court acknowledges that the First and the Ninth Circuits have also rejected requests to apply Buckley's major purpose test to a state's regulation of political committees in line with the reasoning of the Seventh Circuit. See Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 59 (1st Cir. 2011) (declining to apply Buckley's "so-called 'major purpose' test" to Maine's non-major-purpose PAC definition because the test is simply "an artifact of the Court's construction of a federal statute"); Hum. Life of Wash. Inc. v. Brumsickle, 624 F.3d 990, 1009–10 (9th Cir. 2010) (rejecting "proposed bright-line prohibition on regulating groups with only 'a' primary purpose of political advocacy" because Buckley's major-purpose statement "does not indicate that an entity must have that major purpose to be deemed constitutionally a political committee").

Despite the precedent from these other circuits, the Court determines that the role of a district court in the Tenth Circuit is clear: the Tenth Circuit must apply circuit precedent as faithfully

and accurately as it can.  The Court reads the Tenth Circuit cases NMYO and CRCL to signal that Buckley's major purpose test is a constitutional requirement applied to the regulation of express advocacy. That conclusion, to a large extent, decides the dispute here and counsels that the Court not treat Buckley as a statutory rule, as the First, Seventh, and Ninth circuits do.

In CRLC, the Tenth Circuit addresses a Colorado constitutional amendment that requires registration and reporting by political committees.  498 F.3d at 1137.  The Plaintiffs challenge the definition of "political committee" under this constitutional amendment, which defines the term as "any person, other than a natural person, or any group of two or more persons, including natural persons that have accepted or made contributions to expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates."  CRLC, 498 F.3d at 1141.  The Defendant first argues that the district court was incorrect to determine that the political committee definition was unconstitutional, because "its reasoning was based upon the flawed assumption that the major purpose component is constitutionally compelled by Buckley."  CRLC, 498 F.3d at 1153. The Defendant also argues that the Supreme Court's later decision in McConnell reevaluates Buckley, because the Supreme Court decided in McConnell that the distinction between issue advocacy and express advocacy in Buckley was "an endpoint of statutory interpretation" and that therefore this necessitates the conclusion that Buckley's major purpose test was merely a product of statutory interpretation and not constitutionally compelled either.  CRLC, 498 F.3d at 1153.  The Tenth Circuit rejects both of Defendant's arguments, however.  See CRLC, 498 F.3d at 1153.  First, the Tenth Circuit concludes that "there is little question that Buckey's 'major purpose test' is left unaltered in the wake of McConnell."  CRLC, 498 F.3d at 1153.  Second, the Tenth Circuit decides that a $200.00 trigger, standing alone, is incompatible with a "major purpose" test.  CRLC, 498 F.3d at 1153.  The Tenth Circuit explained that "the amount of money an organization must accept

or spend -- $200 -- is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets." CRLC, 498 F.3d at 1153 (quoting Colo. Right to Life Comm., Inc. v. Davidson, 395 F.Supp.2d 1001, 1021 (D.Colo.2005)).  The Tenth Circuit thus concluded that a $200.00 trigger could not serve as a proxy for the major purpose test, reasoning that for some groups -- for example ones with budgets of $200,000.00 -- a $200.00 expenditure is a trivial amount.  CRLC, 498 F.3d at 1154.

In NMYO, the Tenth Circuit addresses an attempt by the New Mexico Secretary of State to regulate two 501(c)(3) nonprofit organizations as political committees under the New Mexico Campaign Reporting Act ("NMCRA").  See 611 F.3d at 671, 673.  Under the NMCRA, an organization that operates "primarily for a political purpose" or "any organization that spends over $500 in one year on a political ad campaign constitutes such a political committee."  NMYO, 611 F.3d at 679.  The Tenth Circuit concludes that this automatic classification of organizations as political committees based on a $500.00 trigger "contradicts the Supreme Court's repeated admonition that only organizations that have 'the major purpose' of electing or defeating a candidate may be forced to register as political organizations."  NMYO, 611 F.3d at 679.  Therefore, the Tenth Circuit concludes that the attempt to regulate the organizations as political committees under the $500.00 trigger provision is unconstitutional as applied.  NMYO, 611 F.3d at 679.

The Court concludes, when looking at the precedent of the Tenth Circuit, that the rule within the Tenth Circuit is that an entity must satisfy the major purpose test to be regulated as a political committee.  Defendants attempt to distinguish this Tenth Circuit precedent by arguing that the plaintiffs in both CRLC and NMYO engaged only in issue advocacy and not express advocacy; whereas the Plaintiffs in the case before the Court wish to engage in express advocacy.  Motion at 7.  The Court concludes, however, that this is a distinction without a difference.  The Tenth Circuit

has applied Buckley's test to evaluate whether a state appropriately had designated an organization as a political committee under state law. Accordingly, the Court concludes, that it must treat Buckley's "major purpose" test as a Constitutional requirement and not as a statutory requirement, and it must apply Buckley's major purpose test when it engages in the question of whether the City of Albuquerque appropriately designated the Plaintiffs as MFCs.

This conclusion is supported by the Fourth Circuit's decision in North Carolina Right to Life, Inc. v. Leake, 525 F.3d 274 (4th Cir. 2008)(Wilkinson, J.)("Leake"). One of the plaintiffs, NCRL, argues that it should not be classified as a political committee, and that North Carolina's definition of political committee "unconstitutionally burdens political expression." 525 F.3d at 286. North Carolina defined "political committee" as:

> a combination of two or more individuals . . . that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics: (a) Is controlled by a candidate; (b) Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party; (c) Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to § 163-278.19(b); or (d) Has a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.

N.C. Gen.Stat § 163-278.6(14), amended by N.C. Sess. Laws 2007-391. The "plaintiffs contend that Supreme Court precedent only permits the regulation of entities that have *the* major purpose of supporting or opposing a candidate, and, therefore, § 163-278.6(4), by regulating entities that have the support or opposition of a candidate as '*a* major purpose,' unconstitutionally burdens protected political speech." Leake, 535 F.3d at 287. Judge Wilkinson begins by referencing Buckley's mandate that "campaign finance laws must be 'unambiguously related to the campaign of a particular . . . candidate,'" and concludes that "this requirement ensures that the constitutional regulation of elections -- and the financing of campaigns, in particular -- does not sweep so broadly as to become an unconstitutional infringement on protected political expression." Leake, 535 F.3d

- 37 -

at 287 (quoting <u>Buckley</u>, 424 U.S. at 80).  Judge Wilkinson then goes on to explain that "Buckley applied this 'unambiguously campaign related' requirement when analyzing the permissible scope of political committee regulation. Since designation as a political committee often entails a significant regulatory burden -- as evidenced by the requirements imposed by North Carolina -- the Court held that only entities 'under the control of a candidate or *the* major purpose of which is the nomination or election of a candidate' can be so designated.'"  <u>Leake</u>, 525 F.3d at 287 (quoting <u>Buckley</u>, 424 U.S. at 79)(emphasis in <u>Leake</u> but not in <u>Buckley</u>).  The Plaintiffs argue that the fact that North Carolina's definition only requires an organization to have "a major purpose" to be classified as a political committee instead of "the major purpose" runs counter to the major purpose test and therefore is unconstitutional.  <u>Leake</u>, 525 F.3d at 287.  The Fourth Circuit confirms that a political committee must meet the major purpose test to be properly regulated, and so concluding, determines that North Carolina's "a major purpose test" does not satisfy the major purpose test as articulated in <u>Buckley</u>.  <u>See</u> <u>Leake</u>, 525 F.3d at 287-88 ("Buckley's articulation of the permissible scope of political committee regulation is best understood as an empirical judgment as to whether an organization primarily engages in regulable, election-related speech.  Thus, the Court in Buckley must have been using 'the major purpose' test to identify organizations that had the election or opposition of a candidate as their only or primary goal – this ensured that the burdens facing a political committee largely fell on election-related speech, rather than on protected political speech.").  Therefore, the Fourth Circuit concludes that North Carolina's definition of political committee, "a major purpose" instead of "the major purpose" is unconstitutional.  The Court also notes that the Tenth Circuit has cited approvingly to the Fourth Circuit's opinion for the proposition that <u>Buckley's</u> "major purpose" test "sets the lower bounds for when regulation as a political committee is constitutionally permissible."  NMYO, 611 F.3d at 677 (citing <u>Leake</u>, 525 F.3d at

288-89).

The Honorable Daniel Crabtree, District Judge for the District of Kansas, recently ruled in accordance with the Court's conclusion, in Fresh Vision OP, Inc. v. Skoglund, No. 24-4055-DDC-TJJ, 2024 WL 3534739 (D. Kan. July 24, 2024)("Skoglund").  In Skoglund, the plaintiffs moved for a temporary restraining order and preliminary injunction, because "Kansas's Campaign Finance Act allows the state to bestow a political committee status on a group when express advocacy is only *a* major purpose of the group." 2024 WL 3534739, at *3 (citing Kan. Stat. Ann. § 25-4143(*l*)(1)).  Plaintiffs argues that this definition of political committee runs counter to Buckley's major purpose test, because the use of the article "a" instead of "the" allows Kansas to designate an organization as a political committee when express advocacy is just one of its multiple major purposes.  See Skoglund, 2024 WL 3534739, at *3.  Plaintiffs argue that the Tenth Circuit, similar to the Fourth Circuit in Leake, has adopted Buckley's major purpose test.  See Skoglund, 2024 WL 3534739, at *4.  In response, Defendants argue that the Tenth Circuit cases should be distinguished "because neither involved an organization who engaged in express advocacy -- as plaintiffs here did." Skoglund, 2024 WL 3534739, at *5.  The court concludes, however, that this is a distinction without a difference, and that Tenth Circuit precedent is clear that "Buckley's major purpose test applies to a state's regulation of political committees." Skoglund, 2024 WL 3534739, at *5-6.  The court then proceeds to apply the "major purpose" test to Kansas' definition of political committee, and determines that Kansas had not "appropriately designated an organization as a political committee under state law." Skoglund, 2024 WL 3534739, at *6.

The Court concludes, in line with Tenth Circuit precedent, that Buckley's "major purpose" test is a constitutional requirement.  The Court notes that the Tenth Circuit has held explicitly that a monetary trigger, standing alone, "cannot serve as a proxy for the 'major purpose' test . . . ."

CRLC, 498 F.3d at 1154. See also NMYO, 611 F.3d at 679.  Therefore, because the definition of MFCs in the City Charter regulates organizations as political committees solely on the basis of a monetary trigger, the Court determines that the City Charter does not appropriately designate organizations as political committees because the definition does not comply with Buckley's major purpose test, and therefore is unconstitutionally overbroad.  Entities that advance and/or oppose candidates regularly, are MFCs, and the City can impose its restrictions on them.  If an entity who does not typically engage in advancing or opposing candidates wants to get involved in a candidate campaign, it can do so without being subject to the rules and regulations for political committees or MFCs, if it can show that its major or primary purpose is not to advance or oppose candidates. To avoid the MFC regulations, the entity must show that most of its activity is not related to candidate campaigns, which should avoid new organizations popping up on the eve of an election to become a conduct of unregulated candidate advocacy or opposition.

The question then becomes whether the Plaintiffs' major or primary purpose is to advance or oppose candidates.  The Court begins with the first plaintiff, Center for Civic Action ("Civic Action").  CCA's stated primary purpose is "educating, engaging, and mobilizing historically underrepresented communities in important legislative and policy campaigns in New Mexico." Complaint at 2.  On its face, that mission concerns legislative and policy advocacy -- not candidate advocacy.  The Defendants effectively concede as much.  They characterize CCA as engaging in "electoral policy," but they never contend that CCA's primary purpose is to support or oppose candidates.  Response at 3-4.

The second plaintiff, ProgressNow New Mexico ("PNNM"), identifies its primary purpose as engaging "in lobbying activities for or against bills during the state legislative session, conduct[ing] education campaigns on the role oil and gas plays in our state politics, and

monitor[ing] online disinformation narratives."  Complaint at 3.  Although the Defendants assert that PNNM engages in express advocacy in this particular instance, they do not argue -- and offer no evidence -- that PNNM's major purpose is candidate advocacy rather than the legislative and policy work PNNM describes.  See Response at 4.

Finally, Semilla Action's stated primary purpose is to influence "policy and engag[e] communities in climate and racial justice movements."  Complaint at 3.  Again, the Defendants do not contend that Semilla Action's major purpose is to advance candidates; they argue only that Semilla Action intends to spend money on a candidate-related communication here.  Response at 4.  That is not the inquiry the major purpose test demands.  Because the record contains no evidence that any Plaintiffs' major purpose is to advance or oppose candidates -- and because Defendants do not even attempt to make that showing -- the Court concludes that the Plaintiffs are not political committees or MFCs.  They therefore are not subject to the regulatory regime that applies to such entities.

Although the Defendants do not make these arguments in their Response, they advance two new arguments at the hearing for why the "major purpose" test should not apply under Citizens United v. Federal Election Commission, 558 U.S. 310 (2010)("Citizens United").  In Citizens United, a nonprofit corporation seeks declaratory and injunctive relief against the FEC, "asserting that it feared it could be subject to civil and criminal penalties if it made through video-on-demand, within 30 days of primary elections, a film regarding a candidate seeking nomination as a political party's candidate in the next Presidential election."  558 U.S. at 880.  The relevant question in Citizens United is whether, under the challenged federal statute, BCRA § 311, televised electioneering communications funded by anyone other than a candidate must include a disclaimer that "____ is responsible for the content of this advertising."  558 U.S. at 913-914.  Applying

exacting scrutiny -- because the nonprofit is engaging in express advocacy -- the Supreme Court upholds the disclaimer requirement.  The Supreme Court reasons that: (i) the disclaimer advances an important governmental interest in clarifying that the advertisement is not funded by a candidate or political party; (ii) the public has a legitimate interest in knowing who is speaking about a candidate shortly before an election; and (iii) Citizens United identifies no evidence that disclosure requirements chill donations by exposing donors to threats or retaliation.  See 558 U.S. at 367-371.

At the hearing the Defendants advance two distinct propositions.  First, the Defendant contends that Citizens United permits the government to regulate express advocacy so long as the regulation occurs close enough to an election.  See November 18, 2025 Tr. 21:1-12 (Baker).  Because this election is weeks away -- December 9, 2025 -- the Defendants argues that they may regulate the Plaintiffs' express advocacy.  Second, the Defendant argues that the Court should disregard the major-purpose test, because the nonprofit in Citizens United is subject to regulation despite lacking a major purpose of express advocacy.  See November 18, 2025 Tr. at 30:1-25.  Neither argument persuades the Court for the same, dispositive reason. The statute in Citizens United requires a disclaimer "Whenever . . . any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate."  52 U.S.C.A. § 30120.  By contrast, the City Charter's definition of MFCs regulates organizations as political committees solely because they cross a monetary threshold.  See generally Albuquerque Charter.

Under Buckley, the government can regulate express advocacy.  Citizens United reaffirms that principle.  The nonprofit corporation in Citizens United was involved in express advocacy.  There was no issue whether the government could regulate the nonprofit; the issue in Citizens United is what the standard of review is for those regulated.

In Buckley, the issue is different.  While it makes clear that the government may regulate express advocacy, it indicates that certain entities can engage in express advocacy and not be subject to regulation.  The Supreme Court is concerned about overbreadth and chilling core First Amendment speech if entities not in the day-to-day candidate advocacy have to comply with burdensome government regulations.  The Supreme Court then says the government cannot, for First Amendment purposes, regulate these entities the same way it can regulate entities that are set up primarily to advance or oppose candidates.  Thus, Buckley indicates whom the government can regulate.  Citizens United, by contrast, sets forth how much a regulated entity may be regulated.

The First, Seventh, and Ninth circuits have certainly pointed out the pitfalls of this interpretation of Buckley, but their approach, that the government can regulate all express advocacy regardless of the character is inconsistent with Buckley. It does not give context to the major-purpose test and writes it out of the caselaw.  The government can regulate express advocacy without regard for the character of the entity; heads the government wins, and tails the government wins, regardless of the character of the entity, as long as the speech that the government is regulating is expressive advocacy. While there is some logic to that approach, it is not consistent with Buckley leaving some entities unregulated.

Under Buckley, when the government attempts to regulate an organization as a political committee, that is not in the business of advancing or opposing candidates, the Court must apply the "major-purpose" test.  Buckley, 424 U.S. at 77-81.  That issue -- whether the Plaintiffs can be regulated at all -- is the central issue here.  Because Citizens United does not address who can be regulated, it does not control this case. If the government can regulate an entity's express advocacy, Citizens United supplies the level of scrutiny.

**B.    THE COURT CONCLUDES THAT PLAINTIFFS ARE NOT BOUND BY THE CLERK'S RULES DONOR DISCLAIMER REQUIREMENTS, BUT ARE BOUND BY GENERAL DISCLAIMER REQUIREMENTS.**

Plaintiffs do not make the "strong showing" required for TRO relief, regarding the City Clerk's rules, because they have not shown that the Clerk's Rules violate any specific limitation in the City Charter.  See Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681, (2025)(stating that the equitable relief of ultra vires "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute.")(quoting Railway Clerks v. Association for Benefit of Non-contract Employees, 380 U.S. 650, 660 (1965)). Plaintiffs' argument rests on an attenuated inference that, because the City Charter references "candidate[s]" and "Measure Finance Committee[s]" when defining campaign materials, or discussing certain requirements, the implicit inference is that the Clerk can only create rules for those two groups.  Motion at 14.  But as both Swinney v. Deming Bd. of Educ., 1994-NMSC-039, 117 N.M. 492, 873 P.2d 238 (1994)("Swinney"), and the Supreme Court's ultra vires jurisprudence make clear, an ultra vires action exists only when an administrative rule violates or explicitly conflicts with a specific prohibition in the law governing the agency.  See Nuclear Regul. Comm'n v. Texas, 605 U.S. at 681 (discussing how courts have "strictly limited nonstatutory ultra vires review to 'painstakingly delineated' procedural boundaries)(quoting Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964)).  In Swinney, the Supreme Court of New Mexico finds that the rights Deming Public School's Official Manual ("Manual") creates violate provisions from the School Personnel Act, NMSA 1978, §§ 22-10-1 to -26 (Repl.Pamp.1993).  See Swinney, 1994-NMSC-039, ¶ 9, 117 N.M. 492, 494, 873 P.2d 238, 240.  The violation occurs, because the Manuel gives certain nontenured employees "de facto tenure" protections, but the School Personnel Act explicitly states "nontenured employees [have] no expectation of continued employment."

Swinney, 1994-NMSC-039, ¶ 7, 117 N.M. 492, 494, 873 P.2d 238, 240.  The Supreme Court of

New Mexico holds the Manual's grant of de facto tenure status to be ultra vires, because the rights

it creates violates state law.  See Swinney, 1994-NMSC-039, ¶ 9, 117 N.M. 492, 494, 873 P.2d

238, 240.  Plaintiffs identify no such violation between the City Charter and the Clerk's Rules.

The Plaintiff's fail to show that the Clerk's Rules directly conflict with the City's Charter.

Any apparent conflict arises not from the text, but from an unduly narrow reading of the City

Charter, one that treats the categories of candidates and MFCs as exhaustive rather than

foundational.  If, as Plaintiff asserts, the Charter prohibits the Clerk from creating rules, unless

they pertain to candidates or MFCs, then the City's entire transparency framework could be easily

circumvented.  But courts interpreting campaign-finance schemes have rejected constructions that

would render entire regulatory schemes easily circumvented.  See McConnell v. Fed. Election

Comm'n, 540 U.S. 93, 95 (2003)(overruled on other grounds)(noting that the government's interest

in preventing "the actual or apparent corruption" of elected officials justifies "not only contribution

limits themselves, but also laws preventing the circumvention of such limits"); see also Fed.

Election Comm'n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 456

(2001)(stating that "all Members of the Court agree that circumvention is a valid theory of

corruption").  Nothing in the Charter indicates that it intended to create such a loophole.

Accordingly, Plaintiffs' ultra vires theory does not withstand scrutiny under the governing

legal standard.  Plaintiffs do not identify, because none exists, any specific Charter prohibition that

the Clerk's Rules violate, nor have they demonstrated that the Clerk's Rules illegally commandeer

powers expressly withheld by the City's Charter.  Instead, their argument amounts to a

disagreement with the Clerk's reasonable interpretation of his delegated responsibilities, the very

type of dispute that falls well short of the narrow, "painstakingly delineated" boundaries of ultra

vires review described in Supreme Court jurisprudence.  On this record, Plaintiffs cannot establish a likelihood of success on the merits, let alone the "strong showing" required for emergency injunctive relief.  Because the Clerk's Rules comport with the Charter and further the Charter's transparency objectives, the Court declines to enjoin the Clerk's Rules.

Although the Court concludes that the Clerk did not exceed the authority delegated under the City's Charter, the Court must independently assess whether the Clerk's Rules comport with the First Amendment standards Buckley and Citizens United articulate.  In Buckley, the Supreme Court subjects the disclaimer and disclosure "requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  Citizens United, 558 U.S. at 366 (quoting Buckley, 424 U.S. at 64, 66, 96).  Citizens United reaffirms that principle and upholds BCRA's disclaimer requirement, because it served the informational interest recognized in Buckley, providing the electorate with the identity of the speaker so voters may evaluate the message and "make informed choices in the political marketplace."  See 558 U.S. at 367 (stating that "the public has an interest in  knowing who is speaking about a candidate shortly before an election").  The Supreme Court emphasizes that disclaimers minimize confusion, ensure voters understand who is speaking, and avoid misleading anonymity, while still imposing no ceiling on speech and preventing no one from speaking.  See Citizens United, 558 U.S. at 366.  Thus, Citizens United's approval of disclaimer regimes rested on the narrow ground that they inform the electorate about the source of election spending, while imposing minimal burdens on protected expression.  See, 558 U.S. at 366

The Clerk's Rules donor disclosure requirements exceed the constitutional boundaries articulated in those cases, however.  Unlike the disclaimer provisions upheld in Citizens United and Buckley, the Clerk's donor disclosure requirements create an impermissible burden that chills

the speech of speakers whose primary purpose is not express advocacy. Plaintiffs represent that the donor disclaimer requirements chill their speech, because their donors may not continue contributing to the organization if their names were disclosed. In contrast, the Defendants provide no justification as to why donor requirements further the governments interest more than standard disclaimers. The Court concludes Clerk's donor disclosure requirement impose burdens on speech not justified by a "sufficiently important" governmental interest and not substantially related to the informational rationale. Accordingly, the Defendants are enjoined from enforcing against the Plaintiffs the Clerk's Rules requiring the disclaimer and disclosure of the top five donors and secondary donors if any of the top five donors are an entity, and the Defendants are not enjoined from enforcing the against Plaintiffs the Clerk's Rules requiring disclaimers that all campaign materials display a clear and conspicuous disclaimer stating information on how the material was paid for.

## II.    THE COURT CONCLUDES THAT THE PLAINTIFFS CAN DEMONSTRATE IRREPARABLE HARM IF THE MFC REGISTRATION AND DISCLOSURE REQUIREMENTS, AS WELL AS THE CLERK'S RULES DONOR DISCLAIMER REQUIREMENTS, ARE IMPOSED, BUT NOT IF THE GENERAL DISCLAIMER REQUIREMENTS ARE IMPOSED.

To merit a TRO, a party must establish that it will suffer irreparable injury if the court denies the requested relief. See Mrs. Fields Franchising, 941 F.3d at 1232. Under the Tenth Circuit standard, "a plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009)(quoting Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1260 (10th Cir. 2003)). To justify interim relief, that harm must not be purely speculative and must be "likely to occur before the district court rules on the merits." RoDa Drilling Co. v. Siegal, 552 F.3d at 1258 (quoting Greater Yellowstone Coal.,

321 F.3d at 1260). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Hobby Lobby, 723 F.3d at 1145 (quoting Heideman v. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

Plaintiffs assert that the potential enforcement of the challenged City Charter and the Clerk's Rules provisions against the Plaintiffs is chilling the Plaintiffs "from engaging in core political speech during the election cycle." Motion at 15. The Plaintiffs further assert that "[n]o damages remedy can repair this harm once the election has passed." Motion at 15. Finally, the Plaintiffs contend that their "opportunity to participate in the political process cannot be restored after the fact." Motion at 15. In response, Defendants assert only that "[p]laintiffs would not suffer an irreparable injury in the absence of a preliminary injunction because they are not likely to succeed on the merits." Response at 20.

In CRLC, discussed above, the Tenth Circuit evaluated CRLC's injury -- in a footnote standing analysis. 498 F.3d at 1145 n.6. The Tenth Circuit determined that CRLC had "suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity" and had suffered "when it [had to] either make significant changes to its operations to obey the regulation, or risk an investigation and citation." CRLC, 498 F.3d at 1145 n.6. Here, the plaintiffs assert that they have engaged in self-censorship, and been chilled from engaging in their intended protected First Amendment speech, core political speech, because of fear of enforcement of the City Charter and Clerk's Rules. See Motion at 4 ("All of the plaintiffs reasonably fear imminent enforcement of Albuquerque's campaign finance laws and rules, which would subject Plaintiffs to fines, penalties, and reputational harm. The chilling effect has already deterred the Plaintiffs from engaging in political speech."). The Court therefore concludes that the Plaintiffs have lost First Amendment freedoms, and that therefore this loss "unquestionably

constitutes irreparable injury."

The Tenth Circuit has, however, "linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).  Therefore, because the Court determines that the Plaintiffs are not likely to succeed on the merits with regards to its challenge to the general disclaimer provisions, the Court determines that the Plaintiffs are not entitled to a presumption of irreparable injury on this claim.  And, because the Plaintiffs have only asserted a mere assertion that the harm implicates First Amendment claims, this is insufficient without more to determine that Plaintiffs will suffer irreparable harm from the enforcement of general disclaimer provisions.

### III.    THE COURT CONCLUDES THAT THE BALANCE OF HARMS WEIGHS IN THE PLAINTIFFS' FAVOR, BECAUSE THEY WOULD SUFFER MORE HARM FROM THE INJUNCTION'S DENIAL THAN THE DEFENDANTS WOULD FROM ITS IMPOSITION.

The Court concludes that the harm that will accrue before this case is resolved on the merits outweighs the minimal damage that a preliminary injunction would inflict on the Defendants.  The Plaintiffs contend that in the context of First Amendment rights, and particularly enforcement of campaign finance laws, the Tenth Circuit has consistently held that the injury to a plaintiff deprived of First Amendment rights almost always outweighs potential harm to the government if an injunction is granted.  Motion at 15 (citing Verlo v. City & Cnty. of Denver, 124 F.Supp.3d 1083, 1092 (D. Colo. 2015) and Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012)).  The Plaintiffs further assert that the Defendants will suffer no harm from temporary non-enforcement of unconstitutional provisions, whereas Plaintiffs face "fines, reputational harm, and chilled speech," and that therefore the equities weigh in favor of injunctive relief.  In response, Defendants appear

to make a public interest argument, arguing that it is in the interest of the people of Albuquerque to know who is paying for campaign advertising, and that "Plaintiffs seek to frustrate that determination." Response at 20. The Defendants argue that the balancing of equities is "about the people's interest in disclosure, not just in this election but in future elections, versus Plaintiffs' asserted right to conceal their donors in the December 5 run-off." Response at 20. The Defendants also assert that the public will be harmed because "if the injunction is granted, it will mean that the closing days of the run-off election campaign will be conducted under different rules than either the general municipal election or the first half of the runoff campaign." Response at 21 (citing Purcell v. Gonalez, 549 U.S. 1, 4-6 (2006)). Further, the Defendants maintain that Plaintiffs are sophisticated parties who can, and have, complied with the City's requirements, as well as state-level requirements," and therefore any burden on Plaintiffs to comply is slight. Response at 20.

The Court concludes that the balance of harms weighs in Plaintiffs' favor in regards to the MFC reporting and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, because these are burdensome requirements that chill the Plaintiffs' participation in the election cycle, and therefore deprive Plaintiffs of First Amendment rights, the deprivation of which almost always outweighs harm to the government. The Court concludes, however, that the balance of harms does not weigh in Plaintiffs' favor with regards to the general disclaimer requirements, because merely disclosing the entity of that paid for an ad is not a substantial burden on Plaintiffs', and the Court acknowledges that the government has a "compelling interest in preserving the integrity of its election process" and preserving election transparency for the public.

## IV.   THE COURT CONCLUDES THAT THE REQUESTED INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

The Tenth Circuit has concluded that "it is always in the public interest to prevent the violation of a party's constitutional rights." Hobby, 723 F.3d at 1147. Here, the Plaintiffs argue

that "the public interest is served by protecting free political expression and ensuring government compliance with the Constitution."  In response, the Defendants reiterate their arguments from the balance of harms section, and state that "because Plaintiffs have not demonstrated that they are likely to succeed on the merits" Plaintiffs' contention that protecting the First Amendment is always in the public interest must fail.

The Court concludes, similar to its balance of harms analysis, that the public interest weighs in favor of protecting the Plaintiffs' First Amendment rights in regards to the MFC reporting and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, because these are burdensome requirements that chill the Plaintiffs' participation in the election cycle.  The Court concludes, however, that the public interest does not weigh in favor of granting injunctive relief from the general disclaimer requirements, because these requirements do not heavily constrain Plaintiffs' First Amendment rights and the public has an interest in transparency and knowing who is paying for campaign advertising.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Temporary Restraining Order, filed November 11, 2025 (Doc. 2), is granted in part and denied in part; (ii) the Defendants are enjoined from enforcing the Measure Finance Committees registration and reporting requirements, in City Charter Article XIII §§ 2(y), 4(c), 4(c)(3), 4(d), 4(d)(2)(F), 4(i), 4(n), against the Plaintiffs; (iii) the Defendants are enjoined from enforcing the donor disclaimer requirements imposed on "Independent Expenditure, Coordinated Expenditures and MFC Supporting or Opposing a Measure" requiring the disclaimer and disclosure of the top five donors and secondary donors if any of the top five donors are an entity, in Clerk's Rules Part 18(B); (iv) the Defendants are not enjoined from enforcing against the Plaintiffs the Charter and Clerk's Rules disclaimer requirements requiring that all campaign materials display a clear and conspicuous disclaimer

stating information on how the material was paid for, in City Charter Article XIII, Sec 5(b) and

Clerk's Rules Part 18(A); (v) the Court concludes that the Plaintiffs do not need to provide a bond;[2]

and (vi) the Court sets a hearing on preliminary injunction on December 3, 2025, at 9:00 am.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Nicholas T. Davis
Davis Law New Mexico
Albuquerque, New Mexico

-- and --

Sara Berger
Sara Berger Law
Portland, Oregon

    *Attorneys for the Plaintiffs*

---

[2] Under rule 65(c), the Court may grant a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security' " and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)). Neither party has addressed the subject of a bond, so the Court must determine on its own a suitable bond. See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)). Here, monetary damages are not at issue, so the Court will not issue a bond.

Mark T. Baker
Matthew E. Jackson
Peifer, Hanson, Mullins & Baker, P.A.
Albuquerque, New Mexico

*Attorneys for the Defendants*