**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CENTER FOR CIVIC ACTION,
PROGRESSNOW NEW MEXICO, and
SEMILLA ACTION,

      Plaintiffs,

vs.                                                                              No. CIV 25-1120 JB/JHR

CITY OF ALBUQUERQUE BOARD OF
ETHICS AND CAMPAIGN PRACTICES, and
ETHAN WATSON, in his capacity as City Clerk,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction, filed November 11, 2025 (Doc. 2)("Motion"). The Court enters a Temporary Restraining Order, filed November 19, 2025 (Doc. 14). The Court holds a hearing on the Plaintiffs' request for preliminary injunction on December 3, 2025. <u>See</u> Clerk's Minutes at 1, filed December 3, 2025 (Doc. 21). The primary issues are: (i) whether the Plaintiffs are likely to succeed on the merits in demonstrating that the City of Albuquerque Charter ("Charter") rules mandating the formation of Measure Finance Committees ("MFCs"), and therefore imposing registration, disclosure, and disclaimer requirements for a political committee or any person or combination of two or more persons when such person or people either accept political contributions or make political expenditures in excess of $250.00, impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, under the First and Fourteenth Amendments, U.S. CONST. amend I, XIV, such that the Charter rules are unconstitutional; (ii) whether the Plaintiffs are likely to succeed on the merits in proving that the City Clerk's rules, specifically disclaimer rules which require that

Independent Expenditures, Coordinated Expenditure, and MFC Supporting or Opposing a Measure, disclose their top five donors and top two secondary donors, impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, under the First and Fourteenth Amendments, U.S. CONST. amend I, XIV, such that the City Charter rules are unconstitutional; and (iii) whether the Plaintiffs are subject to the general disclaimer requirements in the City Charter and Clerk's Rules.   The Court concludes that: (i) the Plaintiffs are likely to succeed on the merits in demonstrating that the Charter rules mandating the formation of MFC impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, because the City Charter rules do not satisfy exacting scrutiny; (ii) the Plaintiffs are likely to succeed on the merits in proving that the City Clerk's rules, specifically disclaimer rules which require that Independent Expenditures, Coordinated Expenditure, and MFC Supporting or Opposing a Measure, disclose their top five donors and top two secondary donors, impermissibly burden the Plaintiffs' Constitutional right to free speech and free expression, because the City Charter rules do not satisfy exacting scrutiny; and (iii) the Plaintiffs are subject to the general disclaimer requirements in the City Charter and Clerk's Rules, because these requirements satisfy exacting scrutiny.

## **FINDINGS OF FACT**

Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must [ ] state the findings and conclusions that support its action."  Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the

basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); <u>Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505</u>, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." <u>Heideman v. S. Salt Lake City</u>, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1188. Accordingly, the Court finds as follows:

      1.     **<u>The Parties</u>.**

      1.     Plaintiff Center for Civic Action ("Civic Action") is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code. Plaintiff's Verified Complaint for Declaratory and Injunctive Relief ¶ 42, at 11, filed November 11, 2025 (Doc. 1)("Complaint").

      2.     Civic Action is a social welfare organization formed for the purpose of educating, engaging, and mobilizing historically underrepresented communities in important legislative and policy campaigns in New Mexico. <u>See</u> Complaint ¶ 44, at 11.

      3.     Civic Action has participated in the Albuquerque municipal elections in prior years and plans to do so in this December 9, 2025 runoff election, and in future elections by supporting or opposing Albuquerque candidates and supporting or opposing Albuquerque ballot measures. <u>See</u> Complaint ¶ 47, at 12.

      4.     Civic Action's annual budget is approximately $1,000,000.00. <u>See</u> Complaint ¶ 46, at 12.

      5.     Civic Action intends to expend approximately $25,000.00 in political speech

concerning the Albuquerque run-off election.  See Complaint ¶ 49, at 12.

7.      These expenditures include making monetary or in-kind contributions to MFCs, distributing advertisements, and canvassing voters to support or oppose run-off candidates for the Albuquerque municipal election.  See Complaint ¶ 49, at 12.

8.      Plaintiff ProgressNow New Mexico ("ProgressNow") is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code.  See Complaint ¶ 52, at 12.

9.      ProgressNow is a social welfare organization formed for the primary purpose of creating an ongoing issue advocacy culture in New Mexico by focusing on amplifying the voices of those systematically excluded, ultimately giving communities the tools they need to shape their own future.  See Complaint ¶ 54, at 13.

10.     ProgressNow has participated in the Albuquerque municipal elections in prior years, and plans to do so in this December 9, 2025 runoff election, and in future elections by supporting or opposing Albuquerque candidates, and supporting or opposing Albuquerque ballot measures. See Complaint ¶ 57, at 13.

11.     ProgressNow's annual budget is approximately $360,000.00.  See Complaint ¶ 56, at 13.

12.     ProgressNow would like to spend approximately $15,000.00, in political speech concerning the Albuquerque run-off election.  See Complaint ¶ 58, at 13.

13.     These expenditures include distributing paid social media advertisements to support or oppose run-off candidates for the Albuquerque municipal elections.  See Complaint ¶ 58, at 13.

14.     During the past election cycle in 2023, ProgressNow spent $1,500.00 via Google Ad Buys to disseminate a voter guide for Albuquerque municipal candidates.  See Declaration of

Alissa Barnes, ¶ 3, at 1, filed December 3, 2025 (Doc. 19)("Barnes Declaration").

15.    ProgressNow spent approximately 0.5% of its annual expenditures on this voter guide.  See Barnes Declaration ¶ 3, at 1.

16.    Because the voter guide included endorsements of certain Albuquerque candidates, and because the cost to distribute the voter guide exceeded $250.00, ProgressNow was required to register as a Measure Finance Committee (MFC).  See Barnes Declaration ¶ 4, at 1.

17.    The process of establishing the MFC required ProgressNow to obtain a new Employer Identification Number with the Internal Revenue Service and open a new bank account, as well as submit two IDs and seven forms to the City of Albuquerque.  See Barnes Declaration ¶ 6, at 2-3.

18.    In managing the MFC, ProgressNow's Executive Director and Finance Director spent a minimum of three hours per week calculating the digital ad spend, allocating that spend among the various candidates that ProgressNow supported or opposed, reporting the expenditures to the City, and uploading images of the voter guide.  See Barnes Declaration ¶ 7, at 2.

19.    During the election period, ProgressNow was required to file eight contribution and expenditure reports, and spent over $1,000.00 in attorneys' fees to help navigate the reporting, disclosure, and disclaimer requirements.  See Barnes Declaration ¶ 7, at 2.

20.    During the election cycle, ProgressnNw also spent time uploading monthly bank statements and responding to email messages from the City, and at the end of the election cycle had to close their MFC bank account and provide proof to the City of that closure.  See Barnes Declaration ¶ 8, at 2.

21.    Because of ProgressNow's experience in the 2023 election, in 2025 ProgressNow concluded that the cost and burden to manage an MFC outweighed the benefit of participating in

the benefit of participating in the Albuquerque election.

22.  ProgressNow's top five donors for the years 2024 through 2025 total $510,000.00 with the fifth largest donor giving ProgressNow $20,000.00.  See Barnes Declaration ¶ 12, at 2.

23.  Four of the five top donors require that all of their funds be spent on non-electoral activities, and the remaining top five donor limits to only 10% of its total award for electoral spending.  See Barnes Declaration ¶ 12, at 2.

24.  Compliance with the City of Albuquerque's requirements that ProgressNow disclose its top five donors and the top two donors to ProgressNow's top five donors would jeopardize 95% of ProgressNow's top revenue because all five donors either restrict or prohibit funds for electoral purposes.  See Barnes Declaration ¶ 14, at 2-3.

25.  ProgressNow plans to continue to engage in the Albuquerque run-off election through the end of the current election cycle by distributing paid social media advertisements to support or oppose run-off candidates for the Albuquerque municipal election.  See Barnes Declaration ¶ 15, at 3.

26.  Plaintiff Semilla Action is a New Mexico nonprofit corporation tax exempt under Section 501(c)(4) of the Internal Revenue Code.  See Complaint ¶ 62, at 14.

27.  Semilla Action is a social justice and environmental advocacy organization that works to influence policy and engage communities in climate and racial justice movements.  See Complaint ¶ 64, at 14.

28.  Semilla Action wants to participate in this and future elections by supporting or opposing Albuquerque candidates, and supporting or opposing Albuquerque ballot measures.  See Complaint ¶ 67, at 14.

29.  Semilla Action has not participated in prior Albuquerque elections because of the

requirements that Albuquerque imposes upon Albuquerque MFCs.  <u>See</u> Complaint ¶ 67, at 14.

30.    Semilla Action intends to spend approximately $20,000.00 in political speech concerning the Albuquerque run-off election.  <u>See</u> Complaint ¶ 68, at 14.

31.    These expenditures include canvassing voters and providing door literature to support or oppose run-off candidates for the Albuquerque municipal election.  <u>See</u> Complaint ¶ 68, at 14.

32.    Defendant Ethan Watson is the duly appointed City Clerk of Albuquerque, and is responsible for administering elections, overseeing campaign finance disclosures, and implementing the City's campaign finance laws and rules.  <u>See</u> Complaint ¶ 10, at 4.

33.    The Albuquerque City Charter, Albuquerque, Albuquerque City Charter Art. XIII § 2(y), https://codelibrary.amlegal.comcodes/albuquerque/latest/albuqcharter/0-0-0-471 ("Albuquerque Charter"), vests the City Clerk with authority to promulgate rules, issue guidance, and enforce compliance with campaign finance requirements, including the power to investigate, refer matters to the Board of Ethics and Campaign practices, and impose administrative penalties. <u>See</u> Complaint ¶ 10, at 4.

34.    The Plaintiffs sued Defendant Ethan Watson in his official capacity as City Clerk, and at all times relevant to the Complaint, Watson acts under color of state and municipal law.  <u>See</u> Complaint ¶¶ 10-11, at 4.

35.    The City of Albuquerque, pursuant to Albuquerque City Charter XII, establishes Defendant Albuquerque Board of Ethics and Campaign Practices ("Board of Ethics"), an administrative body.  <u>See</u> Complaint ¶ 12, at 4.

36.    The Board of Ethics is charged with the authority to interpret, administer, and enforce the City's campaign finance laws and ethics code, including adjudicating complaints,

imposing fines, and issuing advisory opinions.  See Complaint ¶ 12, at 4.

37.    The Plaintiffs sued the Board of Ethics in its official capacity as the entity responsible for applying and enforcing the campaign finance rules and regulations that are the subject of this action and, at all times relevant to the Complaint, acts under color of State and municipal law.  See Complaint ¶¶ 12-13, at 4-5.

**2.    The Albuquerque Charter.**

38.    The Albuquerque Charter defines a MFC:

> [A] political committee or any person or combination of two or more persons acting jointly in aid of or in opposition to the effort of anyone seeking to have their name placed on the ballot for city office, a petition to place a measure on the ballot pursuant to Article III of this Charter, voter approval or disapproval of one or more measures on the ballot and/or the election to, or recall from, office of one or more candidates for office when such person or people have accepted contributions in excess of $250 or make expenditures in excess of $250 for any of the purposes listed heretofore.

Albuquerque Charter Art. XIII § 2(y).

39.    The Albuquerque Charter defines "person" as "any individual, cooperative association, club, corporation, company, firm, partnership, joint venture syndicate, profit or nonprofit organization, or other entity."  Albuquerque Charter Art. XIII § 2(z).

40.    The Albuquerque Charter requires that MFCs register with the City Clerk once they raise or spend more than $250.00 in support of or opposition to a city measure or candidate.  See Albuquerque Charter Art. XIII § 6.

41.    The Albuquerque Charter mandates that each MFC establish one campaign checking account per election, the MFC must deposit all contributions into that account, and the MFC must where all contributions received must be deposited into that account, and the MFC must make all disbursements from that account.  See City Charter Art. XIII § 4(c).

42.    On a monthly basis, the MFC must submit bank statements reflecting the prior

month's activity to the Campaign & Election Auditor by the second Monday of each month, for as long as the MFC must file reports.  <u>See</u> Charter Art. XIII § 4(c)(3).

43.    The MFC must file regular statements with the City Clerk disclosing:

a.    The total of all contributions.
b.    For individual contributors: name, address, occupation, employer (where applicable), business address, and the amount of each contribution and cumulative totals.
c.    For non-individual contributors: name, address, nature of business or activities, and identities of owners or managers of the contributor, plus the amount of each contribution and cumulative totals.
d.    All expenditures, including reimbursements, the nature of the expenditure, and payee names and addresses.
e.    If the MFC supports or opposes more than one candidate or measure, the disclosures must allocate contributions and expenditures to the specific candidate(s) or measure(s) appropriately, and any overlapping expenses must be apportioned pro rata.

Albuquerque Charter Art. XIII § 4(d).

44.    Reporting continues until the MFC files a dissolution report affirming the MFC no longer exists and that its bank account balance is zero.  <u>See</u> Albuquerque Charter Art. XIII § 4(d)(2)(F).

45.    The final campaign financing statement must disclose the method by which the MFC disposes of any remaining funds – returns funds to donors, gifts to charity, or transfers to the City's General Fund, or retains for runoff.  <u>See</u> Albuquerque Charter Art. XIII, § 4(i).

46.    The Albuquerque Charter requires the MFCs to file with the City Clerk images of all broadly distributed campaign material on or before the day that the financial report disclosing the expenditure for said campaign material is due.  <u>See</u> Albuquerque Charter Art. XIII § 5(a).

47.    The Albuquerque Charter requires that candidates and chairpersons of MFCs ensure that all campaign materials display a clear and conspicuous disclaimer stating information on how the MFC paid for the material and any additional information which the rules that the City Clerk

promulgates requires.  See Albuquerque Charter Art. XIII § 5(b).

48.    The Albuquerque Charter defines "campaign material" as "any published, printed, or broadly distributed campaign advertising or communications such as newspaper advertisements, handbills, petitions, circulars, letters, radio or TV broadcasts, cable distributions, social media sites, websites, electronic or telephonic transmissions or similar written material used in a campaign by a candidate or Measure Finance Committee."  Albuquerque Charter Art. XIII § 2(d).

49.    The MFCs are subject to civil penalties -- "a public reprimand or . . . a fine not to exceed the maximum amount authorized by state law, or do both" -- if they fail to comply with the City Charter and the Clerk's Rules' registration and reporting requirements.  See City Charter Art. XIII § 10.

**3.    The Clerk's Rules.**

50.    The Clerk's Rules take effect on February 10, 2025. See Notice of Final Rulemaking -- Election Code, CITY OF ALBUQUERQUE -- CITY CLERK, https://www.cabq .gov/clerk/news/notice-of-final-rulemaking-election-code-1.

51.    The Clerk's Rules "apply to candidates, Measure Finance Committees, candidate committees, and all individuals, entities, and organizations governed by, or subject to, the provisions of the City Charter and State Law."  2025 Rules by the Albuquerque City Clerk for the Election Code and the Open and Ethical Election Code of the City Charter, Part 2(C), at 5, filed November 11, 2025 (Doc. 1)("Clerk Rules").

52.    The Clerk's Rules acknowledge that if the Rules "conflict with the provisions of the City Charter or State Law, the provisions of the City Charter or State Law shall prevail."  Clerk's Rules Part 2(B), at 5.

53.    The Clerk's Rules require the MFCs and candidates to disclose the name of the

campaign or committee that authorizes the distribution or broadcast of campaign materials.  See Clerk's Rules Part 18(A), at 39.

54.     The Clerk's Rules define "disclaimer" as "a disclosure and means a statement identifying the person(s), organization(s), or political committee(s) who paid for, or is otherwise responsible for funding or authorizing campaign materials.  It includes any notice required to ensure transparency about the origin, financial backing, and authorization of such materials."  Clerk's Rules Part 1(4), at 4.

55.     The Clerk's Rules contain additional disclaimer requirements for Independent Expenditure, Coordinated Expenditures, and MFC Supporting or Opposing a Measure:

> 1.     **In addition** to the required disclaimers, campaign materials produced for Independent Expenditures, or Measure Finance Committees shall include:
>
>> a.     The words "**Paid for by**" followed by the name of the entity making the expenditure and its Chairperson;
>>
>> b.     The words "**Top Five Donors" followed by a list of the five (5)** persons or entities making the largest aggregate donations to the entity during the twelve (12) month period before the date of the communication; and
>>
>> c.     For **Independent Expenditures and Measure Finance Committees**: A statement that the campaign material is not authorized by any candidate or candidate's campaign committee.
>>
>> d.     For **Coordinated Expenditure**: A statement that it is authorized by a campaign or committee, and the communication must include the name of the campaign or committee that authorized the expenditure.
>
> 2.     **Secondary Donor.** If any of the top five donors is a committee, organization, or other entity the disclaimer must also disclose the name of the **top two donors of $1,000 or more to that committee.**

Clerk's Rules Part 18(B), at 40 (emphasis in original).

## <u>ANALYSIS</u>

The Court grants in part and denies in part the Plaintiffs' request for a preliminary

injunction.  "To obtain a preliminary injunction, the movants must show that '(1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the . . . threatened injury to them outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction [is] not . . . adverse to the public interest.'"  Schwab v. Kansas, 691 F. App'x 511 (10th Cir. 2017)(quoting Fish v. Kobach, 840 F.3d 710, 723 (10th Cir. 2016))(brackets omitted).  The Court first explains why the Plaintiffs are substantially likely to succeed on the merits regarding the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Clerk's Rules general disclaimer requirements.  Next, the Court explains why the Plaintiffs will suffer irreparable harm absent the requested relief on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Clerk's Rules general disclaimer requirements.  Then, the Court addresses the balance of harms factor, and determines that the balance of harms weighs in Plaintiffs' favor on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Clerk's Rules general disclaimer requirements.  Finally, the Court determines that the public interest weighs in Plaintiffs' favor on the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Clerk's Rules general disclaimer requirements, before outlining the relief it provides to Plaintiffs with this Order.

There are some preliminary injunctions that courts disfavor "and so require more of the parties who request them." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v.

Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)).  "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)).  "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harm factors: [plaintiff] must make a strong showing that these tilt in her favor." Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d at 1232 (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)).  Defendants argue that Plaintiffs' requested relief falls into the first and third categories -- "Plaintiffs seek to alter the status quo and ask the Court to provide all the substantive relief (apart from fees and costs) that they could recover were they to prevail at trial on the merits."  Defendants' Response to Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction, at 5, filed November 17, 2025 (Doc. 12)("Response").  The Court concludes that the preliminary injunction that the Plaintiffs seek does meet the qualifications for a "disfavored" preliminary injunction, because the Plaintiffs seek to disrupt the status quo -- changing campaign finance requirements during an election cycle -- and the Plaintiffs are asking for all the substantive relief, apart from fees and costs, that the Plaintiffs could receive at trial.  Therefore, the Court concludes that the Plaintiffs are subject to a higher burden on the likelihood of success on the merits and the balance of harm factors.  The Court nevertheless concludes, however, that the Plaintiffs are able to meet this higher burden and make a strong showing on the likelihood-of-success-on-the-merits and the balance-of-harm factors for the MFC registration and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, but not on the Clerk's Rules general disclaimer requirements.

I.   **THE PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS REGARDING THE UNCONSTITUTIONALITY AS APPLIED TO THE PLAINTIFFS OF THE MFC REGISTRATION AND DISCLOSURE REQUIREMENTS, AS WELL AS THE CLERK'S RULES DONOR DISCLAIMER REQUIREMENTS, BUT NOT ON THE MERITS OF THE UNCONSTITUTIONALITY OF THE GENERAL DISCLAIMER <u>REQUIREMENTS</u>.**

To secure a preliminary injunction, a party must first establish that it is substantially likely to succeed on the merits. <u>See</u> <u>Mrs. Fields Franchising, LLC v. MFGPC</u>, 941 F.3d 1221, 1232 (10th Cir. 2019). Under the "disfavored" preliminary injunction standard, the Plaintiffs still do not need to prove their likelihood of success beyond all doubt, but they must make a strong showing that this factor, entitlement to relief on the merits, tilts in their favor. <u>Mrs. Fields Franchising, LLC v. MFGPC</u>, 941 F.3d at 1232 (quoting <u>Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC</u>, 562 F.3d 1067, 1070 (10th Cir. 2009)). For purposes of this preliminary injunction, the likelihood of success on the merits turns on two issues. First, whether the City Charter's Measure Finance Committee regulations' extention of reporting and disclosure requirements beyond political committees to:

> any person or combination of two or more persons acting jointly in aid of or in opposition to the effort of anyone seeking to have their name placed on the ballot for city office, a petition to place a measure on the ballot pursuant to Article III of this Charter, voter approval or disapproval of one or more measures on the ballot and/or election to, or recall from, office of one or more candidates for office when such person or people have accepted contributions in excess of $250 or make expenditures in excess of $250 for any of the purposes listed heretofore

<u>see</u> City Charter Art. XIII, Sec 2(y), survives exacting scrutiny such that it is constitutional. <u>See also</u> Clerk's Rules Section 8(A)(3) (requiring "[a]ny organization whose major purpose is not influencing candidate or ballot measure elections but that receives contributions or makes expenditures aggregating more than $250 for the purpose of influencing the nomination or election of any candidate or political office" to follow the requirements for MFCs). Second, whether the

City Clerk's rules, which apply both general disclaimer requirements and donor disclaimer requirements to entities that are not classified as MFCs, are constitutional as applied.

In Buckley v. Valeo, the United States Supreme Court addressed for the first time the constitutionality of regulations on campaign spending.  The Supreme Court established the "major purpose" test, which narrows the definition of political committee, and allows political committees' speech to be regulated only if the political committee is an entity whose major purpose is the nomination or election of a candidate.  See Buckley, 424 U.S. 1, 79 (1976)(discussing the concern about the statute at issue's definition of political committee being too broad, and reaching "groups engaged purely in issue discussion."   As a result, the Supreme Court cabined the definition of political committee only to "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate")("Buckley").  The Supreme Court in Buckley also, however, upheld regulations on individuals and groups that "are not candidates or political committees" when those groups engage in express advocacy.  See Buckley, 424 U.S at 80 (allowing reporting requirements on non-political committees when those entities engaged in: "(1) [making] contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) [making] expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.").  Later, in Citizens United v. Federal Election Com'n, the Supreme Court both expanded the ability to regulate non-political committees to speech beyond express advocacy, rejecting the "contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy," and explained how to determine whether the regulations imposed on non-political committees are constitutional -- a court must apply exacting scrutiny.  Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 367, 369 (2010)("Citizens

United").

In Citizens United, Citizens United was a nonprofit corporation who created a documentary titled Hillary: The Movie, which is a 90-minute documentary about Hillary Clinton.  See Citizens United, 558 U.S. at 319.  Citizens United wished to pay for the documentary to be available through video-on-demand, and to run advertisements promoting the video-on-demand offering by running advertisements on broadcast and cable television.  See Citizens United, 558 U.S. at 320.  Among other challenges, Citizens United challenged the Bipartisan Campaign Reform Act of 2002 (BRCA) § 311, which imposed  disclaimer and disclosure requirements on the Hillary movie and promotional ads.  See Citizens United, 558 U.S. at 366.  The Supreme Court stated that these requirements are subject to exacting scrutiny to determine their constitutionality.  See Citizens United, 558 U.S. at 366.  The Court determines that Citizens United, in which the Supreme Court upheld regulation of a non-political committee after determining that the regulations survived exacting scrutiny, instructs the Court to use exacting scrutiny when evaluating the constitutionality of regulations imposed on individuals and groups that are not political committees engaging in political speech.

The City of Albuquerque wishes to regulate political committees, but it also wishes to regulate entities that are not political committees.  The Court notes that the City Charter extends disclosure, registration, and disclaimer requirements to political committees, but also to entities making independent expenditures, and organizations "whose major purpose is not influencing candidate or ballot measure elections but that receives contributions or makes expenditures aggregating more than $250 for the purpose of influencing the nomination or election of any candidate or political office."  See Clerk's Rules Section 8(A)(3).  The Court determines that the Plaintiffs in this case, Center for Civic Action, ProgressNow New Mexico, and Semilla Action, are

all not political committees, because their major purpose is not influencing candidate or ballot measure elections.  <u>See</u> Complaint ¶¶ 4, 6, 8, at 3-4.  In order to determine if the City of Albuquerque's challenged election regulations are constitutional as applied to the Plaintiffs,[1] therefore, the Court applies exacting scrutiny.

### A.    THE MFC REGULATIONS AS APPLIED TO THE PLAINTIFFS DO NOT SURVIVE EXACTING SCRUTINY AND ARE THEREFORE UNCONSTITUTIONAL.

To satisfy exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest."  <u>Rio Grande Foundation v. Oliver</u>, 154 F.4th 1213, 1224 (10th Cir. 2025)("<u>Oliver</u>").  To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on the First Amendment rights."  <u>Oliver</u>, 154 F.4th at 1224.  "Exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, [but] it does require that they be narrowly tailored to the government's asserted interest."  <u>Oliver</u>, 154 F.4th at 1224-25.

The Charter lays out the following requirements for MFCs: (i) the MFC must register with the City Clerk, and identify a chairperson and a treasurer, <u>see</u> City Charter Art. XIII, Sec 6; (ii) establish a separate checking account per election, and reporting must continue on this account until "the treasurer files a report that affirms the committee has dissolved or no longer exists, and that its bank account has a zero balance," <u>see</u> City Charter Art. XIII Sec 4(d)(2)(F); (iii) on a monthly basis,

---

[1] The Court notes that the Plaintiffs bring both a facial and as-applied challenge to the City's election regulations.  <u>See</u> Complaint at 1.  "Facial challenges have been described as 'strong medicine' and [are] not generally favored by the courts."  <u>New Mexico Youth Organized v. Herrera</u>, 611 F.3d 669, 677 n. 5 (10th Cir. 2010).  The Court determines, therefore, that because it can provide relief to the Plaintiffs on an as-applied basis, it declines to reach the facial challenge and "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  <u>Colorado Right To Life Comm., Inc. v. Coffman</u>, 498 F.3d 1137, 1156 (10th Cir. 2007).

the MFC must submit bank statements reflecting the prior month's activity to the Campaign & Election Auditor, see City Charter Art. XIII, Sec 4(c)(3); (iv) the MFC must file regular statements with the City Clerk disclosing: (a) the total of all contributions and the identity of each contributor, (b) all expenditures, including reimbursements, the nature of the expenditures, and payee names and addresses, (c) if the MFC supports or opposes more than one candidate or measure, the disclosures must allocate contributions and expenditures to the specific candidate(s) or measures(s), and any overlapping expenses must be apportioned pro rata, see Art. XIII Sec 4(d); (v) if the MFC receives a contribution that exceeds thirty percent of the Mayor's salary, the MFC must immediately change its name to include the name of the contributor, see Art. XIII, Sec 4(n);  MFCs must file with the City Clerk images of all broadly distributed campaign material, see Art. XIIII, Sec 5(a).

In Buckley, the Supreme Court recognized that regulation of express advocacy serves three recognized substantial interests.  See Buckley, 424 U.S. at 66-68.  First, disclosure gives voters information about where political campaign money comes from and how it is spent by the candidate in order to aid voters in evaluating candidates.  See Buckley, 424 U.S. at 66-67.  Second, "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity."  See Buckley, 424 U.S. at 67.  Third, "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above." See Buckley, 424 U.S. at 67-68.

The Court determines that the MFC reporting and disclosure requirements do serve a government interest that the Supreme Court in Buckley recognized as substantial -- allowing the City to gather "the data necessary to detect violations" of other campaign finance requirements. See Buckley, 424 U.S. at 67-68.  The City Clerk expressly states that he relies "on knowing who is

paying into the election to detect violations of other campaign finance rules and laws." Declaration of Ethan Watson, ¶ 3, at 2, filed December 2, 2025 (Doc. 15). Further, the Court concludes that the City of Albuquerque has demonstrated a substantial relationship between this important governmental interest, and the regulations it imposes on MFCs. The MFC regulations directly serve the City of Albuquerque's interest in gathering data to detect election violations, because the MFC regulations require entities that wish to engage in express advocacy during an election cycle to provide the City Clerk with significant information about the entity, including bank statements and regular reports about the entity's contributions and expenditures. See City Charter Art. XIII Sec 4(c)(3), 4(d). The Court determines that this substantially supports the City's interest in identifying electoral violations; in fact, the City admits that in the absence of these MFC regulations, the City has no ability to identify election violations but instead must rely on voluntary reports from the public. Preliminary Injunction Tr. 44:15-17 (Baker). The Court concludes, therefore, that the MFC regulations are substantially related to an important government interest. Where the MFC regulations fail exacting scrutiny, however, is that the regulations are overly broad and burdensome, and therefore are not narrowly tailored to the City of Albuquerque's substantial interest.

The Court can identify no case where the Tenth Circuit or the Supreme Court has upheld the application of regulations such as those that the City seeks to impose on MFCs for non-political committees. The Court further determines that these regulations are incredibly burdensome; Plaintiff ProgressNow states that it "spent more resources managing the MFC process than PNNM spent on paying for electoral ads" during the 2023 election cycle in which ProgressNow complied with the MFC regulations. Barnes Declaration, ¶ 9, at 2. ProgressNow also states that because of its experience during the 2023 election, it concluded in 2025 "that the cost and burden to manage an MFC outweighed the benefit of participating in the Albuquerque election." Barnes Declaration,

¶ 10, at 2.

The Court also notes that the MFC regulations here are more burdensome than regulations imposed on non-political committees under federal law. Federal election law requires only that persons other than political committees making independent expenditures in an amount in excess of $250.00 during a calendar year file a statement identifying whether the independent expenditure is in support of or in opposition to the candidate involved, a certification stating whether or not the independent expenditure is made in cooperation with the candidate, and the "identification of each person who made a contribution <u>in excess of $200</u> to the person filing such statement which was made for the purpose of <u>furthering an independent expenditure</u>." 52 U.S.C. § 30104 (emphasis added). The federal registration and reporting laws do not require the maintenance of a separate bank account, or regular financial reports like the MFC regulations do. More importantly, however, the federal law only requires disclosure of the identity of contributors when the contribution is in excess of $200.00 and the person made such contribution for the furtherance of an independent expenditure. This regulation is significantly less burdensome than the MFC regulations; the MFC regulations have numerous independent requirements that the federal law does not, and further, the federal law limits disclosure of contributors to donations made for the purpose of participating in electoral advocacy, and to donations in excess of $200.00. The MFC regulations have no such limitation; the MFC regulations require disclosure of contributions regardless of the purpose behind the contribution or the dollar amount of the contribution.

The City points to <u>Rio Grande Foundation v. City of Santa Fe</u>, which upheld registration and disclosure requirements because the governmental interest outweighed the burden of the regulations, as support that the MFC regulations should survive exacting scrutiny. <u>See</u> Defendants' Response to Motion for Temporary Restraining Order, or in the Alternative, Preliminary Injunction,

at 11, filed November 17, 2025 (Doc. 12)(citing Rio Grande Found. v. City of Santa Fe, 437 F.

Supp. 3d 1051, 1062-63 (D.N.M. 2020)("Santa Fe").  The Court determines, however, that the MFC

regulations here are more burdensome than the regulations at issue in Santa Fe, and therefore Santa

Fe does not convince the Court that the MFC regulations are narrowly tailored enough to apply to

Plaintiffs, whose major purpose is not electioneering.

In Santa Fe, the court applied exacting scrutiny to uphold the Santa Fe Campaign Code,

which required any person or entity that makes expenditures of $250 or more during a single Santa

Fe election on public communications relating to a candidate or ballot measure [to] disclose certain

information to the city clerk.  Santa Fe, 437 F. Supp. 3d at 1057-58.  Specifically, the Campaign

Code required that:

> Any person or entity that makes expenditures of two hundred fifty dollars ($250) or
> more in the aggregate during a single election to pay for any form of public
> communication . . . that either expressly advocates . . . the approval or defeat of a
> ballot proposition; or refers to a clearly identifiable candidate or ballot proposition
> within sixty (60) days before an election . . . shall thereafter on each of the days
> prescribed for the filing of campaign finance statements, file with the city clerk a
> report of all such expenditures made and all contributions received for the purpose
> of paying for such expenditures on or before the date of the report and which have
> not been previously reported.  Each report shall be submitted on a form prescribed
> by the city clerk.  Contributions shall be specified by date, amount of contribution,
> name, address and occupation of the person or entity from whom the contribution
> was made . . . .  Expenditures shall be specified by date, the amount of the
> expenditure, the name and address of the person or entity where an expenditure was
> made and the purpose of the expenditure.

SFCC § 9-2.6(A).  The report must also include the name of the president, chief executive officer,

or equivalent position and the entity's address.  See SFCC § 9-2.6(C)-(D).  The court upheld these

regulations specifically as to ballot initiatives because the court determined that the plaintiff's

$7,700.00 expenditure to advocate against a ballot measure in a small municipal election created a

substantial governmental interest in the financial disclosures.  Santa Fe, 437 F. Supp. 3d at 1070.

And, the court determined that the burden of the disclosure requirement was not sufficient to

- 21 -

outweigh the significant governmental interest in the election, because the plaintiff had not shown "a reasonable probability that the compelled disclosure. . . will subject them to threats, harassment, or reprisals."  Santa Fe, 437 F. Supp. 3d at 1072.   The Court first notes that the City of Albuquerque's MFC disclosure and regulation requirements are substantially more burdensome than the regulations at issue in Santa Fe; the Santa Fe regulations do not require the opening and maintenance of a separate bank account, bank account disclosures, identification of a treasurer, or a potential name change requirement based on the size of the contribution the organization receives, as the MFC regulations do.  See generally City Charter Art. XIII. See SFCC § 9-2.6(A)-(D)  Further, the plaintiff in Santa Fe "expressly disclaimed reliance on the reporting and regulatory burdens" and therefore in Santa Fe the court considered only the burden placed on the plaintiff from the donor disclosure requirements.  Santa Fe, 437 F. Supp. 3d at 1070.  Here, however, the Plaintiffs directly protest the burdens imposed by the reporting and regulatory requirements of the MFC regulations, as well as disclosure requirements.   See Barnes Declaration ¶¶ 7, 9 (discussing ProgressNow's experience as a registered MFC during the 2023 election, and stating "Managing the MFC was even more burdensome. . . . Because of PNNM's experience in the 2023 election, in 2025 PNNM concluded that the cost and burden to manage an MFC outweighed the benefit of participating in the Albuquerque election").

The Tenth Circuit has recognized that the burden of complying with regulation and registration requirements can be substantial for "small-scale issue committees."  Coal. For Secular Gov't v. Williams, 815 F.3d 1267, 1279 (10th Cir. 2016)("Williams").   The Tenth Circuit in Williams concluded that the requirement that the plaintiff disclose "detailed information about the Coalition's most mundane, obvious, and unimportant expenditures" imposed a heavy burden on the plaintiff.  Williams, 815 F.3d at 1279.  Further, the Tenth Circuit identified that the "financial

disclosure [requirement] imposes a unique burden on small-scale issue committees" and noted how the requirement that the committee disclose personal information about its contributors resulted in the plaintiff losing contributors after they "balk[ed] at producing their addresses or employment information." Williams, 815 F.3d at 1279. The Tenth Circuit also noted that with "small-scale issue committees," lost contributions might affect their ability to advocate. Williams, 815 F.3d at 1279.

While the Plaintiffs in this case are not as small-scale as the plaintiff in Williams, the Court determines that the burdens that the Tenth Circuit identifies in Williams apply equally to the Plaintiffs in this case. Two of the Plaintiffs, Semilla Action and Center for Civic Action, have annual budgets of around $1 million, and the third Plaintiff, ProgressNow, has an annual budget of $360,000.00. See Complaint ¶¶ 46, 56, 66, at 12, 13, 14. None of the Plaintiffs have as their major purpose influencing elections, but instead focus on issue advocacy and engaging communities. See Complaint ¶¶ 4, 6, 8, at 3-4. None of the Plaintiffs intend to spend more than 4% of their annual budget on the Albuquerque municipal election, with the highest dollar spend amount being $25,000.00. See Complaint ¶¶ 49, 58, 68, at 12, 13, 14. The Court determines that, similar to the plaintiff in Williams, the regulatory burdens under the MFC are significant on these small-scale organizations who do not regularly engage in electoral advocacy. During its experience as an MFC in 2023, ProgressNow had to spend over $1,000.00 in attorney's fees navigating the MFC requirements; the regulatory framework is complex enough to require legal aid. See Barnes Declaration ¶ 7, at 2. Further, the Court believes that the unique financial burden that the Tenth Circuit identified in Williams can apply to these Plaintiffs; an organization with a million dollar annual budget is not so large-dollar that it would not notice the loss of contributors in its ability to speak, both in the electoral space but also in its issue advocacy, if the contributors decline to donate

upon learning that they must provide personal information such as their name, address, and place of employment.  See Clerk's Rules Part 8(H)(1).  The Court notes additionally that four of the five current top donors of ProgressNow "require that all their funds be spent on non-electoral activities." See Barnes Declaration ¶ 12, at 2.  The Court, therefore, identifies that a risk currently exists that ProgressNow could lose the majority of its budget if these non-electoral contributors decide to withdraw their donations because of these electoral registration requirements, significantly impairing ProgressNow's ability to speak.

In Santa Fe, the court concluded that a spend of $7,700.00 in a "small municipal election" created a substantial informational interest that outweighed the burden of the regulations, and therefore upheld the Santa Fe municipal election code.  The Court acknowledges that the spend in this municipal election -- Center for Civic Action ($25,000), ProgressNow ($15,000), Semilla Action ($20,000) -- is greater than the spend of $7,700.00 in the Santa Fe and correspondingly the government's interest in regulating the Plaintiffs' spend is greater in this case than in Santa Fe.  See Complaint ¶¶ 49, 58, 68, at 12, 13, 14.  See also Santa Fe, 437 F. Supp. 3d at 1070.  The Court determines, however, that the burden in this case is sufficiently greater than the governmental interest such that the MFC regulations cannot survive exacting scrutiny.  First, Santa Fe did not evaluate the burdens taking into account the burdens of the registration requirements, the paperwork, which is a part of the burden that the Plaintiffs are challenging in this case.  Accordingly, the Court finds that Santa Fe is not instructive in how the burdens should be weighed here.  Second, the City of Albuquerque's MFC regulations are more extensive and burdensome than in the Santa Fe case, and more burdensome than federal election law.  The Court concludes that the City of Albuquerque's interest in monitoring organizations for electoral violations cannot outweigh the burden imposed on the Plaintiffs by the MFC regulations, especially when the MFC regulations go

further than federal election law, and Santa Fe election law. Accordingly, the Court determines that the MFC regulations are unduly burdensome such that they are not narrowly tailored, and therefore cannot survive exacting scrutiny.

**B.    THE CITY'S "PAID FOR BY" DISCLAIMER AND "INDEPENDENT EXPENDITURES AND MEASURE FINANCE COMMITTEES" DISCLOSURE SURVIVE EXACTING SCRUTINY, WHILE THE "TOP FIVE DONOR" DISCLAIMER AND "SECONDARY DONOR" DISCLAIMER DO NOT.**

Next, the Court turns to the City of Albuquerque's disclaimer and disclosure rules. The rules require that campaign materials produced for Independent Expenditures, Coordinated Expenditures, or Measure Finance Committees Supporting or Opposing a Measure include:

> **Disclaimer for Independent Expenditure, Coordinated Expenditure and MFC Supporting or Opposing a Measure**
>
> **In Addition** to the required disclaimers, campaign materials produced for Independent Expenditures, Coordinated Expenditures, or Measure Finance Committees shall include:
>
> The words **"Paid for by"** followed by the name of the entity making the Expenditure and its Chairperson;
> The words **"Top Five Donors" followed by a list of the five (5)** persons or entities making the largest aggregate donations to the entity during the twelve (12) month period before the date of such communication; and
> For **Independent Expenditures and Measure Finance Committees**: A statement that the campaign material is not authorized by any candidate or candidate's campaign committee.
> For **Coordinated Expenditure**: A statement that it is authorized by a campaign or committee, and the communication must include the name of the campaign or committee that authorized the expenditure.
> **Secondary Donor.** If any of the top five donors is a committee, organization, or other entity the disclaimer must also disclose the name of the **top two donors of $1,000 or more to that committee**.
> If the top five donors change due to a new Contribution, any print media shall include the updated list of donors at the next printing of materials.
> *Exception*: Short audio and video advertisements (30 seconds or less) are not required to disclose secondary contributors.

Clerk's Rules Part 18(B). Here, Plaintiffs are subject to these requirements because they qualify

as an MFC; they qualify as an MFC because they are spending more than $250 on materials supporting specific candidates.[2] See Complaint at 11-15. The question before the Court is whether the City of Albuquerque may constitutionally compel those four categories of disclosures. The Court addresses each requirement in turn.

The Tenth Circuit instructs that exacting scrutiny applies to First Amendment challenges to compelled disclosure. See Oliver, 154 F.4th 1213, 1224 (10th Cir. 2025)("Oliver"). Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." Oliver, 154 F.4th at 1224. To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Oliver, 154 F.4th at 1224. "Such scrutiny . . . is appropriate given the deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct in requiring disclosure." Oliver, 154 F.4th at 1224. Although "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." Oliver, 154 F.4th at 1224-25.

---

[2] The Court further notes that it is unclear whether these disclaimer requirements apply to the Plaintiffs at all. These donor disclaimer requirements are found in the Clerk's Rules under Part 18(B), which is titled "Disclaimer for Independent Expenditure, Coordinated Expenditure and MFC Supporting or Opposing a Measure." Clerk's Rules Part 18(B). The Court determines that Plaintiffs all qualify as MFCs under the City Charter, which defines MFCs to include "any person or combination of two or more persons acting jointly in aid of . . . the election to, or recall from, office of one or more candidates for office when such person or people have accepted contributions in excess of $250 or make expenditures in excess of $250 . . . for any of the purposes listed heretofore." The Plaintiffs all allege their intention to make expenditures in excess of $250.00 in support of the election of one or more candidates to office, and therefore will qualify as an MFC. Further, these would be MFCs in support of the election of a candidate, not an MFC in support of a ballot measure. Reading Part 18(B), therefore, which claims to be disclaimer rules for independent expenditures, coordinated expenditures, and MFCs Supporting or Opposing a Measure, the Court concludes that it appears as if the Plaintiffs are not subject to the disclaimer requirements in Part 18(B) of the Clerk's Rules.

The Court begins its analysis with the "Paid for by" disclaimer and the "Coordinated Expenditure" authorization disclosure.  Both requirements are constitutional because the Supreme Court upheld materially similar provisions in Citizens United, 558 U.S. 310, 366 (2010) ("Citizens United").  In Citizens United, the Supreme Court upholds the BCRA § 311 requirements, which requires electioneering communications funded by anyone other than a candidate to include a disclaimer stating that the sponsor "is responsible for the content of this advertising" and that the communication "is not authorized by any candidate or candidate's committee."  Citizens United, 558 U.S. at 366.  The City of Albuquerque's rule likewise requires a "Paid for by" disclosure and a statement that the communication is not authorized by a candidate or candidate committee.  Doc. 1-2 at 40.  As the Supreme Court identified "no constitutional impediment to the application of the BCRA's disclaimer and disclosure requirements to a movie broadcast via video-on-demand," Citizens United, 558 U.S. at 372, so too the Court concludes that the City's parallel requirements are constitutional.  The Court therefore upholds both provisions.

The Court continues its analysis with the "Top Five Donors" disclaimer and the "Secondary Donor" disclaimer.  The starting point is the City of Albuquerque's asserted interest in requiring disclosure of the top five donors to organizations qualifying as MFCs -- and, where those donors are themselves committees or organizations, disclosure of their top two contributors.   The City correctly identifies its interest in informing voters about electoral spending.  See Preliminary Injunction Brief at 11, filed December 2, 2025 (Doc. 18).  The Supreme Court has long recognized this interest: disclosure "provides the electorate with information as to where political campaign money comes from and how it is spent . . . to aid the voters in evaluating those who seek federal office."  Buckley, 424 U.S. at 66-67.  Likewise, identifying the speaker "enables the electorate to make informed decisions and give proper weight to different speakers and messages."  Citizens

United, 558 U.S. at 371.  As such, the City of Albuquerque does have an interest in the "Top Five Donors" and "Secondary Donor" disclaimers.

Having established the City's important informational interest, the Court must determine whether the City of Albuquerque has shown a substantial relationship between that interest and the disclaimers it imposes.  See Oliver, 154 F.4th at 1227.  The Court concludes that the City of Albuquerque makes this showing for the "Top Five Donors" disclaimer but not for the "Secondary Donor" disclaimer.  The City argues that the relationship between these requirements and its interest is "self-evident," because there is "no feasible way to inform the electorate about who is spending tens of thousands of dollars to influence elections absent strong disclosure requirements." Preliminary Injunction Brief at 11.  For the "Top Five Donors" requirement, that is true: the disclosure directly identifies the financial actors behind campaign communications, and thus bears a substantial relationship to the City's informational interest.

The "Secondary Donor" disclaimer, however, bears no such relationship.  It does not identify the speaker of a campaign advertisement -- and in many situations, it actively obscures the identity of the speaker.  As the Honorable Lawrence VanDyke, United States Circuit Court Judge for the United States Court of Appeals for the Ninth Circuit observed, "[a] man may be known by the company he keeps, but not by the company that his company keeps, particularly when his company's company isn't also his company."  No on E v. Chiu, 85 F.4th 493 (9th Cir. 2023)(VanDyke, J., dissenting).  Including the name of a secondary contributor alongside the actual political speaker invites voters to infer an association that does not exist.  That inference will often be wrong.  For example, if an individual donates a large amount to Organization X because they support its cause, and Organization X later becomes one of the Plaintiffs' top five donors, that individual's name would appear on the Plaintiff's advertisement despite the individual

having no knowledge of -- or endorsement of -- the Plaintiffs' political message. That disclosure does not advance the City of Albuquerque's interest in identifying the true speaker; it distorts it. Accordingly, the Court holds that the "Secondary Donor" disclaimer is unconstitutional because it is not substantially related to the government's informational interest, while the "Top Five Donor" disclaimer survives because those who give directly to the political speaker can be fairly associated with the resulting communication.

Despite finding the "Secondary Donor" disclaimer unconstitutional, the Court will continue its analysis to consider whether both the "Top Five Donors" disclaimer and the "Secondary Donor" disclaimer are narrowly tailored enough to withstand exacting scrutiny. To demonstrate narrow tailoring, the City of Albuquerque must establish its need for the disclosure provisions in light of any less intrusive alternatives. See Oliver, 154 F.4th at 1227. The City of Albuquerque argues that the "Top Five Donors" disclaimer is narrowly tailored, because it is restricted to the largest aggregate donations made during the previous twelve-month period. See Preliminary Injunction Brief at 11. It continues: "This numeric limitation cabins Plaintiffs' required disclosures only to their largest donors, who undoubtedly understand that they are contributing money to organizations who regularly engage in express electoral advocacy." See Preliminary Injunction Brief at 11-12. As for the "Secondary donor" disclaimer, the City of Albuquerque argues it is narrowly tailored, because it has a monetary limitation which only requires disclosure of secondary donors who gave $1,000.00 or more to a primary donor that is an organization or committee. See Preliminary Injunction Brief at 12. Moreover, the City of Albuquerque contends that the "Secondary donor" disclaimer is narrowly tailored because it does not apply to audio and video advertisements under thirty seconds. See Preliminary Injunction Brief at 12. The Court disagrees and concludes that both the "Top Five Donors" disclaimer and

"Secondary Donor" disclaimer are not narrowly tailored.

We start with the "Secondary Donor" disclaimer. As a general matter, the Court is not convinced that a mandated secondary disclosure can be constitutional. The Ninth Circuit in No on E v. Chiu upheld such a disclosure, but that conclusion presents several concerns. First, the panel opinion affirming the district court is written by only a single Judge. See No on E v. Chiu, 85 F.4th 493 (9th Cir. 2023). Second, nine Judges join the dissent from the denial of rehearing en banc. See No on E v. Chiu, 85 F.4th 493 (9th Cir. 2023)(Collins, J., Callahan J., Ikuta J., Bennett J., Nelson J., Lee J., Brees J., Bumatay J., VanDyke J., dissenting). As the dissenters explained -- and as the Court has already discussed -- serious questions remain about whether a secondary disclosure is substantially related to a government's interest in identifying the speaker of political materials.

But even if a secondary disclosure could, in theory, survive scrutiny, the Court concludes that this particular "Secondary Donor" requirement is not narrowly tailored. The Tenth Circuit in Independence Institute v. Williams, 812 F.3d 787 (10th 2016), upholds a Colorado law that requires "any person who spends at least $1,000.00 per year on 'electioneering communications' to disclose the name, address, and occupation of any person who donates $250 or more for such communications." Independence Institute v. Williams, 812 F.3d at 789 (emphasis added). Part of the Tenth Circuit's holding that this disclosure requirement is narrowly tailored hinges on the fact that the organization "need only disclose those donors who have specifically earmarked their contributions for electioneering purposes." Independence Institute v. Williams, 812 F.3d at 797. Although Independence Institute v. Williams addresses primary-donor disclosures, its tailoring principle applies with equal force here: disclosure regimes must be limited to donors who intentionally support election-related spending. See Independence Institute v. Williams, 812 F.3d

at 797.  The City of Albuquerque's "Secondary Donor" disclaimer contains no such limitation.  It requires disclosure even when the individual donor has not earmarked funds for political activity and may be entirely unaware that the organization used its funds for a top-five contribution to Plaintiffs.  The Court concludes that this is a significant burden.  Faced with the choice between speaking and exposing donors who reasonably expected anonymity in non-electoral giving, organizations will predictably choose silence.  This chilling effect underscores why the City's "Secondary Donor" requirement is not narrowly tailored.  For example, ProgressNow asserts that it could not even require its top funders to disclose to ProgressNow who their top two donors are.  See Barnes Declaration at 2.  Thus, the City of Albuquerque's "Secondary Donor" requirement imposes an unconstitutional burden because it demands information that regulated entities cannot obtain, forcing them to forgo protected speech rather than attempt compliance.

The City of Albuquerque nonetheless argues that the Court should uphold its "Secondary Donor" disclaimer provision, because the Ninth Circuit upholds a similar donor disclosure provision in No on E v. Chiu.  See Preliminary Injunction Brief at 12.  In No on E v. Chiu, the regulation at issue is San Francisco's Proposition F:

> Under the new ordinance, ads run by primarily formed independent expenditure and ballot measure committees must include a disclaimer listing their top three contributors of $5,000 or more. Id. § 1.161(a)(1). Additionally, "[i]f any of the top three major contributors is a committee, the disclaimer must also disclose both the name of and the dollar amount contributed by each of the top two major contributors of $5,000 or more to that committee.

No on E v. Chiu, 85 F.4th at 498.  The City of Albuquerque's regulation, however, is even more burdensome than the one in No on E v. Chiu.  While the Court does not assign heavy weight to the difference between San Francisco's secondary disclosure threshold of $5,000.00 and Albuquerque's $1,000.00 threshold -- given the disparity in market size -- the structural differences are striking.  Under Proposition F, secondary disclosure is triggered only when (i) the primary

donor contributed at least $5,000.00, and (ii) the primary donor is a committee. See No on E v. Chiu, 85 F.4th at 498. Albuquerque's ordinance contains no comparable limits. If any of the top five donors is a committee, organization, or other entity, the advertiser must disclose the top two contributors of $1,000.00 or more to that entity -- regardless of whether those contributors earmarked their funds for electioneering or even knew their money would reach the advertiser. At the preliminary-injunction stage, the Court is unwilling to validate a more demanding and less tailored regulatory scheme than in No on E v. Chiu. The City's reliance on No on E v. Chiu is therefore unavailing, and the Court concludes that the "Secondary Donor" disclaimer is not narrowly tailored and is thus unconstitutional.

Next, the "Top Five Donors" disclaimer. The Court concludes -- guided by Independence Institute v. Williams -- that the City's requirement does not survive exacting scrutiny. In Independence Institute v. Williams, the Tenth Circuit held that Colorado's disclosure regime was narrowly tailored in significant part because it required organizations to disclose only those donors who "specifically earmarked their contributions for electioneering purposes." Independence Institute v. Williams, 812 F.3d at 797. The City of Albuquerque's "Top Five Donors" provision contains no such safeguard. It instead mandates disclosure of the top five donors who have made the largest aggregate contributions to an organization in the last twelve months, regardless of whether those funds were earmarked -- or even permitted -- for electoral use. See Verified Complaint for Declaratory and Injunctive Relief at 40.

This lack of tailoring is not hypothetical; it is illustrated in the record. Progress Now's top five donor for the years 2023 through 2025 total $510,000.00, with the fifth-largest donor giving $20,000.00. See Barnes Declaration at 2. Four of the top five donors require that all their funds be used only for non-electoral activities. See Barnes Declaration at 2. Thus, if the Court enforced

the City's rule as written, ProgressNow's campaign materials would be required to list four donors whose funds could not have been used to create the materials and who explicitly prohibit electoral use of their contributions.  This compels a disclosure that misattributes political support, and it chills political speech in the precise way the First Amendment guards against.  Organizations like ProgressNow would be forced to choose between speaking and risking the loss of major donors who do not wish to be publicly linked to electoral activity they did not fund, authorize, or endorse. Predictably, such groups will self-censor -- exactly what the Constitution forbids.  For these reasons, the Court finds that the "Top Five Donors" disclaimer is unconstitutional as written.

The City of Albuquerque confirms the Court's concern in its proposed injunction language. See Notice of Proposed Langue at 1, filed December 3, 2025 (Doc. 22).  The City of Albuquerque proposes the following limitation:

> The Defendants are enjoined from enforcing against the Plaintiffs the requirement to disclose the top five donors and secondary donors under City Clerk Rules Part 18(b) only to the extend compliance would require a plaintiff to identify on campaign materials donors that do not permit funding to be used for electoral purposes.

Notice of Proposed Language at 2.  Although this proposed language attempts to narrow the "Top Five Donor" requirement by excluding donors who prohibit electoral use of their funds, it still suffers from a constitutional flaw: it lacks any threshold contribution level that triggers disclosure. The City of Albuquerque continuously invokes No on E v. Chiu as its North Star for the constitutionality of donor-disclosure requirements.  See Preliminary Injunction Brief at 11-12.  Yet San Francisco's Proposition F -- the regulation at issue in No on E v. Chiu -- is materially narrower than the rule before the Court.  See No on E v. Chiu, 85 F.4th at 498.  Proposition F requires disclosure of only the top three contributors who give $5,000 or more.  See No on E v. Chiu, 85 F.4th at 498.  The City of Albuquerque, by contrast, mandates disclosure of the top five donors

with no minimum monetary threshold whatsoever. The record underscores why this omission matters. Four of ProgressNow's top five donors forbid any electoral use of their funds, and therefore need not be disclosed under the City's proposed narrowing. <u>See</u> Barnes Declaration at 2. The fifth donor contributed $20,000.00, but one top donor limits only ten percent of its award for electoral spending. <u>See</u> Barnes Declaration at 2. It is therefore entirely possible that the donor whose funds may be used electorally authorized only $2,000.00 in such spending. Under Proposition F, a donor contributing less than $5,000.00 would not appear on campaign materials at all. Albuquerque's rule, by omitting any threshold, would nevertheless require disclosure. Again, at the Preliminary Injunction phase, the Court is unwilling to validate a more demanding and less tailored regulatory scheme than in <u>No on E v. Chiu</u>. This requirement chills speech. Faced with the prospect of having major donors publicly identified as supporting electoral activity when they expressly capped or restricted such use, ProgressNow has a powerful incentive not to engage in electoral speech at all -- precisely the dynamic the First Amendment forbids. The absence of a monetary threshold thus amplifies the chilling effects and confirms that the "Top Five Donor" disclaimer is not narrowly tailored. Although the City's proposed language addresses the Court's concern about donors who bar electoral use of their funds, it fails to incorporate a contribution threshold akin to the one upheld in <u>No on E v. Chiu</u>. Without such a safeguard, the rule continues to chill protected political expression and remains unconstitutional.

## II. THE PLAINTIFFS CAN DEMONSTRATE IRREPARABLE HARM IF THE MFC REGISTRATION AND DISCLOSURE REQUIREMENTS, AS WELL AS THE CLERK'S RULES DONOR DISCLAIMER REQUIREMENTS, ARE IMPOSED, <u>BUT NOT IF THE GENERAL DISCLAIMER REQUIREMENTS ARE IMPOSED.</u>

To merit a preliminary injunction, a party must establish that it will suffer irreparable injury if the court denies the requested relief. <u>See</u> <u>Mrs. Fields Franchising</u>, 941 F.3d at 1232. Under the Tenth Circuit standard, "a plaintiff satisfies the irreparable harm requirement by demonstrating 'a

significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009)(quoting Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1260 (10th Cir. 2003)).  To justify interim relief, that harm must not be purely speculative and must be "likely to occur before the district court rules on the merits." RoDa Drilling Co. v. Siegal, 552 F.3d at 1258 (quoting Greater Yellowstone Coal., 321 F.3d at 1260).  "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Hobby Lobby, 723 F.3d at 1145 (quoting Heideman v. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003)).

Plaintiffs assert that the potential enforcement of the challenged City Charter and the Clerk's Rules provisions against the Plaintiffs is chilling the Plaintiffs "from engaging in core political speech during the election cycle." Motion at 15.  The Plaintiffs further assert that "[n]o damages remedy can repair this harm once the election has passed."  Motion at 15.  Finally, the Plaintiffs contend that their "opportunity to participate in the political process cannot be restored after the fact."  Motion at 15.  In response, Defendants assert only that "[p]laintiffs would not suffer an irreparable injury in the absence of a preliminary injunction because they are not likely to succeed on the merits."  Response at 20.

In Colorado Right to Life Committee, Inc. v. Coffman, the Tenth Circuit evaluated CRLC's injury -- in a footnote standing analysis.  Colorado Right To Life Comm., Inc. v. Coffman, 498 F.3d 1137, 1145 n.6 (10th Cir. 2007)("CRLC").  The Tenth Circuit determined that CRLC had "suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity" and had suffered "when it [had to] either make significant changes to its operations to obey the regulation, or risk an investigation and citation." CRLC, 498 F.3d at 1145 n.6.  Here, the plaintiffs assert that they have engaged in self-censorship, and been chilled from

engaging in their intended protected First Amendment speech, core political speech, because of fear of enforcement of the City Charter and Clerk's Rules. See Motion at 4 ("All of the plaintiffs reasonably fear imminent enforcement of Albuquerque's campaign finance laws and rules, which would subject Plaintiffs to fines, penalties, and reputational harm. The chilling effect has already deterred the Plaintiffs from engaging in political speech."). The Court therefore concludes that the Plaintiffs have lost First Amendment freedoms, and that therefore this loss "unquestionably constitutes irreparable injury."

The Tenth Circuit has, however, "linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005). Therefore, because the Court determines that the Plaintiffs are not likely to succeed on the merits with regards to its challenge to the general disclaimer provisions, the Court determines that the Plaintiffs are not entitled to a presumption of irreparable injury on this claim. And, because the Plaintiffs have only asserted a mere assertion that the harm implicates First Amendment claims, this is insufficient without more to determine that Plaintiffs will suffer irreparable harm from the enforcement of general disclaimer provisions.

## III.   THE BALANCE OF HARMS WEIGHS IN THE PLAINTIFFS' FAVOR, BECAUSE THEY WOULD SUFFER MORE HARM FROM THE INJUNCTION'S DENIAL THAN THE DEFENDANTS WOULD FROM ITS IMPOSITION.

The Court concludes that the harm that will accrue before this case is resolved on the merits outweighs the minimal damage that a preliminary injunction would inflict on the Defendants. The Plaintiffs contend that in the context of First Amendment rights, and particularly enforcement of campaign finance laws, the Tenth Circuit has consistently held that the injury to a plaintiff deprived

of First Amendment rights almost always outweighs potential harm to the government if an injunction is granted.  See Motion at 15 (citing Verlo v. City & Cnty. of Denver, 124 F.Supp.3d 1083, 1092 (D. Colo. 2015) and Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012)).  The Plaintiffs further assert that the Defendants will suffer no harm from temporary non-enforcement of unconstitutional provisions, whereas Plaintiffs face "fines, reputational harm, and chilled speech," and that therefore the equities weigh in favor of injunctive relief.  In response, Defendants appear to make a public interest argument, arguing that it is in the interest of the people of Albuquerque to know who is paying for campaign advertising, and that "Plaintiffs seek to frustrate that determination."  Response at 20.  The Defendants argue that the balancing of equities is "about the people's interest in disclosure, not just in this election but in future elections, versus Plaintiffs' asserted right to conceal their donors in the December 5 run-off."  Response at 20.  The Defendants also assert that the public will be harmed because "if the injunction is granted, it will mean that the closing days of the run-off election campaign will be conducted under different rules than either the general municipal election or the first half of the runoff campaign."  Response at 21 (citing Purcell v. Gonalez, 549 U.S. 1, 4-6 (2006)).  Further, the Defendants maintain that Plaintiffs are sophisticated parties who can, and have, complied with the City's requirements, as well as state-level requirements," and therefore any burden on Plaintiffs to comply is slight.  See Response at 20.

The Court concludes that the balance of harms weighs in Plaintiffs' favor in regards to the MFC reporting and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, because these are burdensome requirements that chill the Plaintiffs' participation in the election cycle, and therefore deprive Plaintiffs of First Amendment rights, the deprivation of which almost always outweighs harm to the government.  The Court concludes, however, that the

balance of harms does not weigh in Plaintiffs' favor with regards to the general disclaimer requirements, because merely disclosing the entity of that paid for an ad is not a substantial burden on Plaintiffs', and the Court acknowledges that the government has a "compelling interest in preserving the integrity of its election process" and preserving election transparency for the public.

## IV.    THE REQUESTED INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

The Tenth Circuit has concluded that "it is always in the public interest to prevent the violation of a party's constitutional rights." Hobby, 723 F.3d at 1147. Here, the Plaintiffs argue that "the public interest is served by protecting free political expression and ensuring government compliance with the Constitution." In response, the Defendants reiterate their arguments from the balance of harms section, and state that "because Plaintiffs have not demonstrated that they are likely to succeed on the merits," Plaintiffs' contention that protecting the First Amendment is always in the public interest must fail.

The Court concludes, similar to its balance of harms analysis, that the public interest weighs in favor of protecting the Plaintiffs' First Amendment rights in regards to the MFC reporting and disclosure requirements, as well as the Clerk's Rules donor disclaimer requirements, because these are burdensome requirements that chill the Plaintiffs' participation in the election cycle. The Court concludes, however, that the public interest does not weigh in favor of granting injunctive relief from the general disclaimer requirements, because these requirements do not heavily constrain Plaintiffs' First Amendment rights and the public has an interest in transparency and knowing who is paying for campaign advertising.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Temporary Restraining Order or in the Alternative Preliminary Injunction, filed November 11, 2025 (Doc. 2), is granted in part and denied in part; (ii) the Defendants are enjoined from enforcing the Measure Finance Committees

registration and reporting requirements, in City Charter Article XIII §§ 2(y), 4(c), 4(c)(3), 4(d), 4(d)(2)(F), 4(i), 4(n), against the Plaintiffs; (iii) the Defendants are enjoined from enforcing the donor disclaimer requirements imposed on "Independent Expenditure, Coordinated Expenditures and MFC Supporting or Opposing a Measure" requiring the disclaimer and disclosure of the top five donors and secondary donors if any of the top five donors are an entity, in Clerk's Rules Part 18(B); (iv) the Defendants are not enjoined from enforcing against the Plaintiffs the Clerk's Rules disclaimer requirements requiring that all campaign materials display a clear and conspicuous disclaimer stating information on how the material was paid for, in Clerk's Rules Part 18(A); and (v) the Court concludes that the Plaintiffs do not need to provide a bond.[3]

_____
UNITED STATES DISTRICT JUDGE

---

[3] Under rule 65(c), the Court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security' " and may, therefore, impose no bond requirement. RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)). Neither party has addressed the subject of a bond, so the Court must determine on its own a suitable bond. See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)). Here, monetary damages are not at issue, so the Court will not issue a bond.

*Counsel:*

Nicholas T. Davis
Davis Law New Mexico
Albuquerque, New Mexico

-- and --

Sara Berger
Sara Berger Law
Portland, Oregon

      *Attorneys for the Plaintiffs*

Mark T. Baker
Matthew E. Jackson
Peifer, Hanson, Mullins & Baker, P.A.
Albuquerque, New Mexico

      *Attorneys for the Defendants*